[Cite as *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 125 Ohio St.3d 57, 2010-Ohio-134.]

OHIO CONSUMERS' COUNSEL ET AL., APPELLANTS, *v.* PUBLIC UTILITIES

COMMISSION OF OHIO ET AL., APPELLEES. (TWO CASES.)

[Cite as *Ohio Consumers' Counsel v. Pub. Util. Comm.*,

125 Ohio St.3d 57, 2010-Ohio-134.]

*Public utilities — Rate design — Public Utilities Commission order was not unlawful or unreasonable, and the rate-making process was lawfully carried out — Orders affirmed.*

(Nos. 2008-1837 and 2009-0314 — Submitted September 16, 2009 — Decided January 26, 2010.)

APPEAL from the Public Utilities Commission of Ohio, Nos. 07-589-GA-AIR, 07-590-GA-ALT, and 07-591-GA-AAM.

APPEAL from the Public Utilities Commission of Ohio, Nos. 07-829-GA-AIR, 07-830-GA-ALT, 07-831-GA-AAM, 08-169-GA-ALT, and 06-1453-GA-UNC.

_____

**PFEIFER, J.**

### Factual and Procedural Background

**{¶ 1}** In July 2007, Duke Energy Ohio, Inc. ("Duke") filed an application with the Public Utilities Commission of Ohio ("commission" or "PUCO") to increase its gas-distribution rates. See case No. 07-589-GA-AIR. Likewise, in August 2007, the East Ohio Gas Company, d.b.a. Dominion East Ohio ("Dominion") filed an application to increase gas-distribution rates for its service area. See case No. 07-829-GA-AIR.

**{¶ 2}** Several parties, including Ohio Consumers' Counsel ("OCC") and Ohio Partners for Affordable Energy ("OPAE"), intervened in both rate cases. In each case, the parties filed a joint stipulation and recommendation, resolving all issues except the adoption of a new rate design.

**{¶ 3}** As to the rate design, Duke's and Dominion's rate-increase applications proposed a sales decoupling rider as the method by which their required revenue would be collected from each customer class (e.g., residential, industrial, or commercial). A sales-decoupling-rider mechanism allows the utility to offset lower sales through an adjustable rider. The decoupling rider includes a gas-usage component for the collection of most of the utility's distribution costs and a true-up component that allows the utility to recover any lost revenues as a result of decreases in customer usage. In essence, the rider holds the utility harmless from decreases in consumer demand by adding those lost revenues into rates for the following year.

**{¶ 4}** The PUCO staff, however, rejected the utilities' proposed decoupling rider in favor of a modified straight fixed variable ("SFV"), or "levelized," rate design. Under a true SFV design, all fixed distribution costs are recovered through a flat customer charge, and there is no usage component of the distribution charge. Under the *modified* SFV structure, most fixed costs of delivering gas are collected through a higher flat (or "fixed") customer charge, with the remaining fixed costs recovered through a correspondingly lower variable gas-usage component.

**{¶ 5}** The commission issued orders adopting the stipulations in both cases. The commission's orders also approved the SFV rate design, instead of the decoupling rider, for the collection of natural-gas distribution rates.

**{¶ 6}** In Duke's case, the commission ordered that the new rate design be implemented in three phases. Phase one began on June 4, 2008, and replaced Duke's $6 residential-customer charge under the prior rate plan with a monthly charge of $15. The charge was increased on October 1, 2008, to $20.25. On June 1, 2009, the charge was set at its current monthly rate of $25.33.

**{¶ 7}** The PUCO also ordered that Dominion's new SFV rate structure be phased in. Beginning in October 2008, Dominion's fixed customer charges of

$5.70 (East Ohio division rate) and $4.38 (West Ohio rate) under the prior rate plan were replaced with a monthly charge of $12.50. On October 1, 2009, the phase-two charge was increased to the current rate of $15.40.

{¶ 8}   OCC and OPAE filed timely applications for rehearing in both rate cases. The commission rejected their applications.

{¶ 9}   OCC and OPAE appealed the commission's orders in Duke's rate-design case. See case No. 2008-1837. OCC and OPAE also filed notices of appeal in Dominion's rate-design case. See case No. 2009-0314. We consolidated the cases for oral argument and final decision.

**Standard of Review**

{¶ 10} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50.

{¶ 11} This court's task is not to set rates; rather, our task is only to assure that the rates are not unlawful or unreasonable and that the rate-making process itself is lawfully carried out. *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288.

**Analysis**

{¶ 12} OCC and OPAE raise a number of issues challenging the commission's decision to implement the SFV rate design in Duke's and Dominion's rate cases. We find the commission's choice of the modified SFV rate design in these cases to be reasonable and lawful.

*Compliance with Regulatory Practices and Commission Precedent*

{¶ 13} OCC and OPAE contend that the commission's failure to demonstrate a clear need for a change from traditional rate design to a new "radical" rate design resulted in rates that were unjust and unreasonable in

violation of R.C. 4905.22 and 4909.18. They raise various claims that the commission violated its own regulatory practices and precedents when it imposed the SFV rate design on customers.

1. The PUCO justified its adoption of the new rate design

{¶ 14} OCC claims that the commission violated its own precedents when it approved the new SFV rate design. According to OCC, the commission had no authority to depart from the rate design used over the past 30 years without demonstrating a clear need to change its position and concluding that its prior decisions were in error.

{¶ 15} It is true that the commission should respect its own precedents in its orders to assure predictability in the law. But the commission must also be willing to change its policies when appropriate. *Consumers' Counsel v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 49, 51, 10 OBR 312, 461 N.E.2d 303. The commission's orders in both cases explained that natural-gas rate design traditionally allocated a relatively small proportion of the utility's fixed costs to a low fixed monthly customer charge, with the remaining fixed costs recovered through a higher variable usage component. Thus, the ability of a natural-gas utility to recover its fixed distribution service costs hinged in large part on actual sales, even though the company's distribution costs remain fairly constant regardless of how much gas is sold.

{¶ 16} The commission recognized that its decision to adopt SFV was a departure from traditional natural-gas rate design, but it determined that conditions in the natural-gas industry called into question long-standing rate-making practices for gas companies. According to the commission, the natural-gas market is currently characterized by volatile and sustained price increases, causing customers to increase their efforts to conserve gas. These factors in turn have caused a revenue-erosion problem for natural-gas utilities. Moreover, the trend in declining customer usage was historical in nature. The commission

concluded that as long as the bulk of a utility's distribution costs are recovered through the sale of natural gas – as is the case under traditional rate design – the decline in customer usage threatened the utilities' ability to recover their fixed costs of providing service and could cause financial instability.

{¶ 17} Because the PUCO attributed the utilities' revenue deficiency to declining customer usage, the commission determined that a new rate design – one that separates or "decouples" the utilities' recovery of its cost of delivering gas (which are predominately fixed) from the amount of gas that customers actually use (which varies month to month) – was necessary to ensure that Duke and Dominion have sufficient revenues to cover their fixed costs. The PUCO determined that such a rate design would best provide the utilities with adequate and stable revenues and ensure that they would be able to continue to provide safe and reliable service. The commission also found that breaking the link between fixed-cost recovery and gas sales would remove any disincentive of the utilities to promote energy conservation and efficiency.

{¶ 18} In the face of this explanation, OCC argues that the commission failed to explain the need to change the practice by which natural-gas rates had been collected over the past 30 years and why prior rate-design precedent was no longer applicable. But as we have just discussed, the commission described at length its reasons for the shift from the prior rate design to a rate design that separated the utilities' recovery of delivery costs from the amount of gas customers consume. The commission's rationale for choosing the SFV rate design is clearly stated and reasonable.

2. The PUCO did not violate the regulatory principle of gradualism

{¶ 19} OCC and OPAE both claim that the commission failed to follow the regulatory principle of gradualism, which seeks to minimize the impact of rate changes on customers. In Duke's case, the SFV rate design replaced the $6 fixed-distribution charge under the prior rate plan with a monthly charge of $15. The

$15 charge was subsequently increased to $20.25, and Duke's current fixed charge stands at $25.33. Under Dominion's rate plan, fixed charges of $5.70 and $4.38 were replaced with a monthly charge of $12.50. Dominion's customers now pay a monthly fee of $15.40. OCC and OPAE claim that such increases in the monthly charges violate the rate-making principle of gradualism. We find no merit to this argument.

{¶ 20} First, OCC and OPAE have cited no authority that gradualism is a factor that the commission is required to apply in every rate-design case. The lack of a governing statute telling the commission how it must design rates vests the commission with broad discretion in this area. See, e.g., *Payphone Assn. v. Pub. Util. Comm.*, 109 Ohio St.3d 453, 2006-Ohio-2988, 849 N.E.2d 4, ¶ 25. Indeed, the commission found that it is not bound by any statutory requirement relating to gradualism, which is only one of many important regulatory principles.

{¶ 21} Second, the commission did not ignore gradualism. As noted, in order to minimize the impact of the new rates on residential customers, the commission ordered that the new rate design be implemented in phases. Duke's rates were implemented in three phases and Dominion's in two.

{¶ 22} OCC and OPAE counter that the commission's phase-in approach violates the principle of gradualism at each phase. But even if we accept this as true, OCC and OPAE have overlooked the other steps that the commission took to cushion the impact of the new rate design on customers.

{¶ 23} For instance, the commission opted for lower fixed charges that do not reflect the full extent of the utilities' fixed distribution costs. In the Duke case, a strict matching of fixed rates with fixed costs would have resulted in a $30 monthly distribution charge. But the commission set Duke's monthly charge at $20.25 for the first year and $25.33 in year two and beyond. Likewise, Dominion did not recover all its fixed costs through the fixed monthly customer charge. In the first year, Dominion recovered only 71 percent of its annual base revenues

through the $12.50 fixed monthly charge. At its current monthly charge of $15.40, Dominion recovers only 84 percent of the annual base rate revenues.

{¶ 24} In addition, the commission ordered an additional phase-in in the Duke case because it was concerned with implementing the SFV rate design during the summer months, when overall gas consumption is lowest. The commission explained that under SFV, the average residential customer would experience lower bills during the winter months, but higher bills in the summer. The commission ordered Duke's fixed charge to be set at $15 for the first four months to lessen any impact on customers who may have budgeted expecting the traditional lower fixed charge during the low-usage summer months. Moreover, the commission noted in both cases that SFV produces more stable customer bills throughout all seasons because fixed costs are recovered evenly throughout the year.

{¶ 25} The commission also approved pilot programs in both cases that are aimed at helping low-income customers pay their gas bills by providing a $4 monthly discount to mitigate the impact of the new rate plans. The commission further ordered Duke to expand its new pilot program to include 10,000 customers, instead of the 5,000 specified in the stipulation.

{¶ 26} In sum, we find that the commission was not bound in these cases to apply the regulatory principle of gradualism. And even if the commission were bound by this principle, we find that the commission's order is consistent with gradualism. The commission took steps to mitigate the impact of the increased fixed charges on Duke's and Dominion's residential customers, giving customers time to adapt to the new rate structure.

### 3. The PUCO did not violate other regulatory principles

{¶ 27} OPAE contends that the commission also violated other regulatory principles of cost causation, the discouragement of wasteful use of service, the

acceptability of rate design to the public, and the balancing of interests between the utilities and its customers. OPAE's arguments are not persuasive.

{¶ 28} First, as was the case with its gradualism argument, OPAE fails to show that the commission is required by law to adhere to any specific regulatory principle in reviewing rate-design cases.

{¶ 29} Second, the gist of OPAE's argument is that the new rate design results in an unfair subsidy. According to OPAE, the SFV rate design shifts cost responsibility from high-use, high-income customers to low-use, average-use, and low-income customers. While there is a shift in cost-sharing under SFV, OPAE has not shown that the shift in costs results in an unfair subsidy.

{¶ 30} The commission recognized that as with any rate-design change, some customers will be better off and some will be worse off under the SFV rate design. And in fact, the commission found that the SFV rate design will adversely impact low-use customers more, and high-use customers will actually experience a rate reduction. The commission explained that this situation resulted from past inequities in the previous rate design that allowed low-use customers to avoid paying their share of fixed costs. According to the commission, because utilities recovered most of their fixed costs under traditional rate design through a volumetric component, high-use customers were overpaying their own fixed costs and subsidizing low-use customers. The SFV rate design addresses this problem by spreading fixed costs more evenly among all customers and thereby requiring low-use customers to pay a more proportionate share of those costs. Thus, some low-use residential customers may pay more under the new rate design because those customers are no longer being subsidized by higher-use customers.

{¶ 31} OPAE does not challenge the commission's finding that low-use customers have historically paid less than their proportionate share of fixed costs. Instead, OPAE argues that shifting costs from high-use to low-use customers is inequitable because high users make greater use of the distribution system and

should bear a greater share of its costs. But the commission rejected that claim. The commission found that virtually all the utility's distribution costs are fixed and that the cost to serve a residential customer is largely the same regardless of how much gas a customer uses.

{¶ 32} Moreover, in Dominion's case, the commission found that to the extent that there is a subsidy within the general-sales-service and energy-choice-transportation-service classes, the evidence indicated that nonresidential users subsidize residential users. OPAE has offered no evidence that the commission's finding was in error.

{¶ 33} In short, some high-use customers will pay lower rates under the new rate design, but only because they were overpaying their fixed costs under the prior rate plans. And while some low-use customers will pay more under the new rate design, OPAE has not proven that low-use customers are now unfairly subsidizing high-use customers. OPAE's assertions of unfair cost subsidization are unfounded.

*Energy Efficiency and Conservation*

{¶ 34} OCC and OPAE contend that the commission-approved rate plan fails to promote energy efficiency and discourages conservation in violation of state policy.

{¶ 35} Under traditional natural-gas rate design, a utility's ability to recover its fixed costs depends largely on actual gas sales. The commission found that this system gave gas companies an incentive to increase gas sales and prevented them from embracing energy conservation and efficiency efforts. The commission determined that a rate design that decoupled the utility's recovery of the costs of delivering gas from the amount of gas customers actually use would benefit society by reducing the company's incentive to sell more gas.

{¶ 36} The commission considered two methods of decoupling that would accomplish its objective: the SFV rate design and the sales-decoupling rider. The

commission noted that both methods would remove any disincentive by the company to promote energy conservation and efficiency. The commission found, however, that the SFV rate design had the added benefit of producing more stable customer bills by spreading the recovery of fixed costs more evenly through all seasons, a result that would in turn help to reduce winter heating bills. Also critical to the commission's decision was Duke's commitment to provide $3 million for weatherization projects under the proposed stipulation and Dominion's commitment to provide $9.5 million in demand-side management projects.

{¶ 37} In addition, the commission found that the SFV rate design provided customers with more accurate and timely pricing signals. Under the new rate design, the rate for delivering gas to the home is roughly 20 to 25 percent of the total customer bill. In contrast, the largest portion of the customer's bill – 75 to 80 percent assuming normal usage – is for the cost of the gas the customer uses. Thus, according to the commission, gas usage still has the greatest impact on the amount of a customer's bill under SFV. Therefore, customers will still receive the benefits of any conservation efforts.

{¶ 38} OCC and OPAE contend that the SFV rate design violates R.C. 4929.02(A)(4). This section provides that it is the policy of this state to encourage innovation and market access for cost-effective supply-side and demand-side natural-gas services and goods. OCC also claims that the SFV rate plan violates R.C. 4905.70, which requires the PUCO to promote and encourage energy conservation programs in general.

{¶ 39} In *Ohio Partners for Affordable Energy v. Pub. Util. Comm.*, 115 Ohio St.3d 208, 2007-Ohio-4790, 874 N.E.2d 764, OPAE made a closely analogous argument, which this court rejected. In that case, OPAE challenged a commission order contending that the order failed to substantially comply with the public policy outlined in R.C. 4929.02(A)(4), including promoting adequate supplies of natural gas. See *Ohio Partners* at ¶ 24. We stated that the policy

established in R.C. 4929.02(A)(4) is a "guideline" for the commission to weigh in determining whether a utility's services and demand-side and energy-conservation programs complied with the statute. Id. at ¶ 27. Moreover, we rejected OPAE's argument that R.C. 4929.02(A)(4) and 4905.70 required the PUCO to approve any particular demand-side management and energy-conservation programs or specific levels of funding for such programs. *Ohio Partners* at ¶ 36.

{¶ 40} Although we question whether lowering the volumetric rate, by itself, would encourage conservation, where "a statute does not prescribe a particular formula, the PUCO is vested with broad discretion." *Payphone Assn. of Ohio*, 109 Ohio St.3d 453, 2006-Ohio-2988, 849 N.E.2d 4, ¶ 25, citing *Columbus v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 23, 24, 10 OBR 175, 460 N.E.2d 1117. The General Assembly left it to the commission to determine how best to carry out the state's policy goals in R.C. 4929.02(A)(4) and 4905.70. Moreover, conservation is just one of many factors set forth in R.C. 4929.02 that the commission must balance in determining an appropriate natural-gas rate design. See R.C. 4929.02(A)(12).

{¶ 41} Here, the commission found that the SFV rate design advocated by the PUCO staff, Duke, and Dominion – rather than the decoupling rider favored by OCC and OPAE – better achieved the stated public policy goals. Absent a demonstration that the commission's order is clearly unsupported by the record, it will not be disturbed on appeal. *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371. OCC and OPAE have made no such showing.

### *Manifest Weight of the Evidence*

{¶ 42} OCC and OPAE assert that the commission's approval of the SFV rate design in these cases is against the manifest weight of the evidence. On questions of fact, the appellant bears the burden of demonstrating that the commission's decision is manifestly against the weight of the evidence or that the

decision is so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29.

### 1. The Duke Case

{¶ 43} *PUCO's Open Meeting.* OCC first refers us to an open meeting of the PUCO commissioners held in the Duke case on April 23, 2008. According to OCC, the commissioners made repeated references during this meeting to the lack of evidence surrounding the rate impact of the SFV rate design on Duke's residential customers and their conservation efforts. The open session was held after the close of evidence but before the commission issued its opinion and order in this case. The commission speaks through its published opinions and orders. See R.C. 4903.09 (requiring the PUCO to file "findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based on said findings of fact"). All five commissioners signed the commission's opinion and order (Commissioner Paul Centolella concurred in part and dissented in part), and any views of individual commissioners stated prior to the release of the order do not reflect the holding of the commission. Nor are such views evidence. We find that their public comments are irrelevant to whether the commission's decision is against the manifest weight of the evidence.

{¶ 44} *Impact on Low-Income, Low-Use Customers.* OCC contends that the record in this case demonstrates that the SFV rate design harms Duke's low-use, low-income customers and that the commission erred in finding that such customers benefit under the plan. OCC maintains that the majority of low-use customers – including some who are low-income – are forced to subsidize Duke's higher-use customers under the new rate design.

{¶ 45} Contrary to OCC's assertion, the commission did not find that Duke's low-income, low-use customers benefit under the SFV rate design. While the commission did refer to evidence cited by its staff and Duke that SFV will

benefit "most low-income customers," the commission ultimately found that the new rate design would have an adverse impact on Duke's low-income, low-use customers. As a result, the commission took several steps to address those concerns, such as not reflecting the full extent of Duke's fixed costs in the customer charge, phasing in the new rates, and increasing the number of eligible customers for the low-income pilot program. The commission also stated that after the end of the pilot program, it would evaluate the effectiveness of the program in addressing concerns about the impact of the rate design on low-use, low-income customers. Thus, the commission recognized that the SFV rate design would adversely affect low-income, low-use customers, and it took steps to mitigate that adverse effect.

{¶ 46} As to OCC's claim that Duke's low-income, low-use customers will now be forced to subsidize higher-use customers, OCC has offered no record evidence to support that assertion. Moreover, the commission's order contradicts that assertion. As noted earlier, the commission found that the SFV rate design was intended in part to remedy inequities in the prior rate structure that unfairly subsidized low-use customers.

{¶ 47} *Duke's Declining Customer Usage/Revenue Deficiency.* OPAE asserts that there is a lack of evidence supporting the commission's conclusion that reductions in customer usage were the primary reason for Duke's failure to recover its revenue requirement. OPAE states that only 15 percent of Duke's revenue deficiency in this case was attributable to declining usage, and thus, declining usage did not justify the radical new rate design.

{¶ 48} OCC raises a similar argument in its second proposition of law. OCC argues that the commission did not demonstrate a clear need to adopt the SFV rate design because only $6 million – or less than 18 percent – of Duke's $34.1 million proposed rate increase in this case was attributable to declining usage.

**{¶ 49}** The commission did find that "more than 15 percent of Duke's revenue deficiency in this rate case is attributable to declining customer usage," but we question whether this fact favors OCC and OPAE. A revenue deficiency of more than 15 percent would likely cut deeply into any company's profit margin. In any event, OPAE and OCC place too much emphasis on this finding. Evidence indicated that in addition to Duke's revenue deficiency *in this case,* Duke suffered from a revenue-deficiency problem attributable to declining customer usage that was historical in nature.

**{¶ 50}** OPAE also claims that the commission ignored evidence that "residential usage actually increased in three of the past five years over the level of use in the test year in the *previous* rate case, meaning that Duke over-recovered its revenue requirements during those years." (Emphasis sic.) But the fact that evidence exists on both sides of an issue does not justify reversal. In essence, OPAE asks this court to reweigh the evidence. But that is not our function on appeal. See *Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 39. In short, OPAE has not shown that the commission's decision on this issue was against the manifest weight of the evidence.

**{¶ 51}** *Maintaining the Status Quo.* OPAE additionally argues that while the record showed that Duke's earnings had dropped below its authorized rate of return, the record did not demonstrate that Duke's financial stability was threatened in a manner that would justify the commission's decision to switch to the SFV design. According to OPAE, Duke can solve its declining usage problem and revenue shortfall by simply filing new rate-increase applications, as in the past. OPAE further notes that the commission has allowed Duke a rider called the accelerated main replacement rider that would mitigate any difficulty Duke may have in attracting new capital investments for its network. OPAE maintains that

14

with this rider and regular rate increases, there should be no concerns regarding Duke's financial stability.

{¶ 52} OPAE, however, has not cited any evidence in the record that the rider and new rate increases would adequately address Duke's revenue deficiency.

2. The Dominion Case

{¶ 53} *Prospective Studies.* OCC claims that by ordering future studies to evaluate the possible effects of SFV, the commission has acknowledged that the decision to implement the SFV rate design in Dominion's case lacked sufficient record support. According to OCC, the commission is attempting to validate the findings in its order through these prospective studies, and the failure to determine the impact of SFV on Dominion's residential customers before implementing the rate design provides sufficient reason to warrant reversal. We disagree.

{¶ 54} First, OCC has offered no authority for its argument that the commission should have ordered these studies – or required a more comprehensive study of the impact of SFV – *before* implementing the SFV rate design. The issue is whether sufficient evidence supported the commission's order, not whether there could have been more evidence presented.

{¶ 55} Second, any prospective reports resulting from the commission-ordered studies are not evidence in this case. Instead, the reports were ordered to be filed with the commission *after* the PUCO had issued its opinion and order and entry on rehearing. The commission required Dominion to complete a cost-allocation study and submit a report within 90 days of the order. And the commission ordered the Demand Side Management Collaborative—formed as part of the stipulation to "establish appropriate evaluation and selection processes for DSM programs" and composed of Dominion, PUCO staff, OCC, OPAE, and representatives of other parties—to file a report within nine months of the order. In addition, the commission stated its intent to evaluate the one-year, low-income pilot program at the end of the program. Thus, the reports are not part of the

record in this appeal and are not proper for our consideration. See R.C. 4903.13 (requiring consideration of the record by the Supreme Court).

{¶ 56} Third, none of the information sought by these studies was relevant to the commission's decision to move to the modified SFV rate plan in this case. For instance, the cost-of-service study was to be used to determine whether Dominion would be required to separate the residential and nonresidential consumers in its general-sales-service class and energy-choice-transportation-service class. The SFV rate design set Dominion's rates for two years, and whether these classes were appropriately composed or should be split was relevant to setting rates in year three and beyond. And the report ordered from the Demand Side Management Collaborative was merely to obtain information in order to develop additional energy-efficiency improvements and programs. OCC, as a member of the collaborative, should have known that the purpose of the collaborative was to "establish appropriate evaluation and selection processes for [demand-side management] programs" and not to evaluate the impact of the SFV rate design.

{¶ 57} Therefore, we find that these prospective studies do not undermine the commission's order approving Dominion's SFV rate plan.

{¶ 58} *Impact on Low-Use, Low-Income Customers.* OCC challenges the commission's statement that Dominion's low-use customers had not been paying the entirety of their fixed costs under the prior rate design. According to OCC, there is no evidence supporting the commission's finding that high-use customers subsidized low-use customers under the previous rate design. The commission, it argues, has used this unsubstantiated claim to justify approval of the SFV rate design without regard to the adverse impact that SFV has on low-use and low-income residential customers.

{¶ 59} Yet there was evidence before the commission that high-use customers were overpaying their fixed costs under the prior rate plan and thus

subsidizing low-use customers. Consequently, the commission's adoption of the SFV rate design to remedy inequities in the prior rate structure that benefited low-use customers was not unreasonable or unlawful. Moreover, as noted earlier in this opinion, other testimony indicated that if subsidization is still occurring under Dominion's SFV rate design, it is the nonresidential customers who are benefitting the residential customers.

{¶ 60} *Reductions in Customer Usage/Maintaining the Status Quo.* OPAE claims that there is a lack of evidence supporting the commission's conclusion that usage reductions were the primary reason for Dominion's failure to recover its revenue requirements. OPAE also asserts that the record failed to demonstrate that Dominion's financial stability was threatened so as to justify the commission's decision to switch to the SFV design. According to OPAE, Dominion can solve its declining-usage problem and revenue shortfall by simply filing new rate-increase applications as in the past and by relying on the pipeline infrastructure replacement rider to mitigate any difficulty Dominion may have in attracting new capital investments for its network.

{¶ 61} OPAE raised these exact arguments in the Duke case. We reject OPAE's arguments for the reasons previously stated.

*Statutory Notice Requirements*

{¶ 62} OCC maintains that the commission failed to enforce the statutory notice requirements for a rate-increase application as required by R.C. 4909.18, 4909.19, and 4909.43. Duke's and Dominion's rate-increase applications proposed the decoupling-rider rate design instead of the SFV rate design that the commission ultimately approved. Because the commission approved a rate design significantly different from the rate design proposed in the utilities' applications, OCC claims that the public notices in these cases failed to provide sufficient detail of the substance of the requested rate increases.

**{¶ 63}** OCC correctly notes that R.C. 4909.19 requires a public utility applying for a rate increase to provide public notice in a newspaper in general circulation throughout the areas affected by the rate increase that fully discloses "the substance and prayer of such application." And it is also true that Duke's and Dominion's public notices did not include any mention of the SFV rate design adopted by the commission. But that is because the SFV rate design adopted by the commission in these cases was proposed by the PUCO staff in its post-investigation reports. R.C. 4909.19 provides separate notice requirements for a staff report, and OCC does not dispute that those requirements were met.

**{¶ 64}** In *AT&T Communications of Ohio, Inc.*, 51 Ohio St.3d at 153, 555 N.E.2d 288, we rejected an identical notice argument on virtually identical facts. In that case, GTE had filed an application to increase the rates of its basic local-exchange service. Id. at 150. After its investigation, the PUCO staff rejected GTE's proposed increase in the basic exchange rate. Id. Instead, the staff recommended a different rate design that increased the carrier-common-line charge ("line charge") and certain other rates. Id. at 150-151. The commission, however, rejected its staff's proposal, opting instead to approve a rate increase of all existing rates, including the line charge. Id. at 151.

**{¶ 65}** On appeal, AT&T and MCI, ratepayers in the case, argued that GTE's public notice did not comply with R.C. 4909.19 because the notice failed to mention the line charge. *AT&T Communications*, 51 Ohio St.3d at 151-152, 555 N.E.2d 288. We rejected that argument, finding that GTE was not required to include the line charge in its public notice because GTE did not seek an increase of that charge in its rate-increase application. Id. The increase in the line charge was proposed by the PUCO staff, and we noted that GTE had included language in its application notice that advised the public that the commission may adopt recommendations different from those proposed in the rate application, including adjusting rates not mentioned in the application. Id.

{¶ 66} In these cases, as in *AT&T Communications*, the PUCO staff proposed a rate design that differed from the design that Duke and Dominion had proposed in their applications. In addition, the public was on notice that the commission could alter the rate design proposed in the rate applications. Duke's and Dominion's public notices included provisions – similar to the one in GTE's application notice in *AT&T Communications* – stating that recommendations that differ from the utilities' rate application may be made by the staff of the commission.

{¶ 67} Therefore, because the utilities did not propose the SFV rate design in their rate-increase applications, the SFV rate design was not within the "substance and prayer" of the applications. Thus, R.C. 4909.19 did not require the utilities to mention SFV in their public notices.

{¶ 68} OCC contends that *Commt. Against MRT v. Pub. Util. Comm.* (1977), 52 Ohio St.2d 231, 6 O.O.3d 475, 371 N.E.2d 547, controls the outcome of this issue. In *MRT,* Cincinnati Bell proposed a new rate service in its application, but failed to specifically mention the new service in its public notice. We found that Cincinnati Bell's public notice failed to comply with the provisions of R.C. 4909.19. *MRT*, 52 Ohio St.2d at 234. According to OCC, these cases involve the same issue as *MRT* because Duke's and Dominion's customers were never provided notice of the SFV rate design that was approved by the commission.

{¶ 69} However, *MRT* is distinguishable on its facts. In *MRT,* outside of a general reference to the proposed new service, Cincinnati Bell's public notices failed to mention or provide any information of the new service proposed in its rate application. 52 Ohio St.2d at 231. Unlike Cincinnati Bell, Duke and Dominion did give public notice of the rate plan – the sales-decoupling rider – proposed in their applications.

{¶ 70} Moreover, *MRT* is fully consistent with *AT&T Communications.* Indeed, we cited the reasoning of *MRT* with approval in *AT&T Communications,* 51 Ohio St.3d at 153, 555 N.E.2d 288. We noted in *AT&T Communications* that key to our holding in *MRT* was the fact that Cincinnati Bell's subscribers were denied an opportunity to oppose the new service. Id. We found that Cincinnati Bell's failure to give proper notice denied the Committee Against MRT – who represented the subscribers in the designated service area – an opportunity to present evidence challenging Cincinnati Bell's new service. Id. at 152-153.

{¶ 71} In contrast, here, OCC – the statutory representative of Ohio residential utility customers – was able to voice its concerns over the SFV rate design proposed in the staff reports. After being served with the staff reports, OCC was able to file objections to the reports and introduce evidence in opposition of the SFV rate design. In short, *MRT* undercuts OCC's position on this issue.

{¶ 72} In sum, the commission did not fail to enforce the statutory notice requirements for rate-increase applications. *AT&T Communications*, 51 Ohio St.3d 150, 555 N.E.2d 288, is on point. Therefore, consistent with *AT&T Communications*, we hold that R.C. 4909.19 did not require Duke or Dominion to mention the SFV rate design in their public notices because that rate design was not part of their rate applications.

## Conclusion

{¶ 73} In this appeal, OCC and OPAE challenge how the commission designed the rates for gas-distribution service for Duke's and Dominion's residential customers. They ask us to intervene in an area-rate design – that is within the commission's expertise. But appellants have not sustained their burden of showing that the commission's orders in these cases are unlawful or unreasonable, or that the rate-making process itself was unlawfully carried out.

*AT&T Communications*, 51 Ohio St.3d at 154, 555 N.E.2d 288.  Therefore, we affirm the decisions of the Public Utilities Commission of Ohio.

Orders affirmed.

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

—————————————

Janine L. Migden, Consumers' Counsel, and Larry S. Sauer, Joseph P. Serio, Michael E. Idzkowski, and Gregory J. Poulos, Assistant Consumers' Counsel, for appellant Ohio Consumers' Counsel.

Colleen L. Mooney and David C. Rinebolt, for appellant Ohio Partners for Affordable Energy.

Richard Cordray, Attorney General, Duane W. Luckey, Section Chief, and William L. Wright, Thomas G. Lindgren, Stephen A. Reilly, and Anne L. Hammerstein, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Amy B. Spiller, Elizabeth H. Watts, and Rocco O. D'Ascenzo, for intervening appellee Duke Energy Ohio, Inc.

Jones Day, David A. Kutik, Douglas R. Cole, Paul A. Colbert, and Grant W. Garber, for intervening appellee Dominion East Ohio.

Henry W. Eckhart, urging reversal for amicus curiae Natural Resources Defense Council.

Richard J. Triozzi, Cleveland Law Director, and Steven L. Beeler and Julianne Kurdila, Assistant Law Directors, urging reversal for amicus curiae city of Cleveland.

—————————————