[Cite as *In re Application of Columbus S. Power Co.,* 138 Ohio St.3d 448, 2014-Ohio-462.]

IN RE APPLICATION OF COLUMBUS SOUTHERN POWER COMPANY ET AL.;

INDUSTRIAL ENERGY USERS-OHIO ET AL., APPELLANTS;

PUBLIC UTILITIES COMMISSION, APPELLEE;

OHIO POWER COMPANY, INTERVENING APPELLEE.

[Cite as *In re Application of Columbus S. Power Co.,* 138 Ohio St.3d 448, 2014-Ohio-462.]

*Public utilities—Electric security plan—R.C. 4928.143—Commission's decision to permit recovery of carrying charges under R.C. 4928.143(B)(2)(d) was lawful and reasonable—Utility not required to prove charges are "necessary" in order to recover costs under R.C. 4928.143(B)(2)(d)— Commission did not err in denying recovery of previously collected "provider of last resort" charges—Refund of POLR revenues already collected from customers by utility would violate prohibition against retroactive ratemaking—Orders affirmed.*

(No. 2012-0187—Submitted October 8, 2013—Decided February 13, 2014.)

APPEAL from the Public Utilities Commission of Ohio,

Nos. 08-917-EL-SSO and 08-918-EL-SSO.

————————————

LANZINGER, J.

## I. SUMMARY

**{¶ 1}** This second appeal stems from the approval by the Public Utilities Commission ("commission" or "PUCO") of the first electric security plan of the American Electric Power operating companies, Columbus Southern Power Company and Ohio Power Company (collectively, "AEP"). We first reviewed the commission's approval of the electric security plan in 2011. *In re Application of Columbus S. Power Co.,* 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d

655. There, we held that the commission committed reversible error on three issues: (1) granting AEP a retroactive rate increase (but finding that no refund was available), (2) approving the recovery of carrying costs associated with environmental investments without proper statutory authority, and (3) authorizing the provider-of-last-resort ("POLR") charge without sufficient evidence. We remanded the POLR-charge and carrying-costs issues for further consideration. *Id*. at ¶ 8-21, 31-35, 22-30.

{¶ 2} On remand, the commission determined that the environmental-investment carrying costs were lawful under R.C. 4928.143(B)(2)(d). *In re Application of Columbus S. Power Co.,* Pub. Util. Comm. Nos. 08-917-EL-SSO and 08-918-EL-SSO, at 14-15 (Oct. 3, 2011) (the "*Remand Order*"). But the commission found that AEP had not presented evidence of its actual POLR costs and directed the company to deduct that charge from its tariff schedules. *Id.* at 22-24. The commission also rejected a request to recover the amounts of the POLR charge and carrying costs that AEP had collected from April 2009 through May 2011. *Id.* at 34-36.

{¶ 3} Following rehearing, the Office of Consumers' Counsel ("OCC") and Industrial Energy Users-Ohio ("IEU") filed this appeal, raising numerous challenges to the commission's remand orders. None has merit. Therefore, we affirm the orders of the commission.

## II. FACTS AND PROCEDURAL BACKGROUND

{¶ 4} R.C. 4928.141(A) requires electric-distribution utilities to provide to consumers a "standard service offer of all competitive retail electric services necessary to maintain essential electric service to consumers, including a firm supply of electric generation service." The utility may provide the offer in one of two ways: through a "market rate offer" under R.C. 4928.142 or through an "electric security plan" under R.C. 4928.143.

**{¶ 5}** AEP chose the second option and filed an application for approval of an electric security plan ("ESP"). The ESP statute permits numerous rate components, R.C. 4928.143(B)(2), but says very little about rate calculation. The only substantive requirement is that the plan must be "more favorable in the aggregate as compared to the expected results" of a market-rate offer. R.C. 4928.143(C)(1).

## A. ESP approval and court remand

**{¶ 6}** On March 18, 2009, the commission issued an opinion and order approving AEP's first ESP, to be in effect from 2009 to 2011. *In re Application of Columbus S. Power Co.,* Pub. Util. Comm. Nos. 08-917-EL-SSO and 08-918-EL-SSO (Mar. 18, 2009) (the "*ESP Order*"). Following two rounds of rehearings, OCC and IEU appealed. We eventually held that the commission had granted AEP a retroactive rate increase of $63 million in violation of R.C. 4928.141(A), as well as the rule established in *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 141 N.E.2d 465 (1957). Nevertheless, OCC had not established that it was entitled to its requested remedy of a refund, and that ruling was conclusive of the issue. *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 8.

**{¶ 7}** We also held that the commission erred when it found that AEP could recover environmental-investment carrying costs under R.C. 4928.143(B)(2). We remanded the matter to allow the commission to specifically determine whether any of the nine categories of cost recovery under R.C. 4928.143(B)(2)(a) through (i) authorized the recovery of carrying costs. *Id*. at ¶ 31-35.

**{¶ 8}** Finally, we determined that the commission approved more than $500 million in POLR charges over the three years of the plan. *Id.* at ¶ 22. POLR costs are intended to compensate for the utility's risks in standing ready to serve customers who purchase generation service from a competitive supplier and then

3

return to the utility for generation service. *See Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 39, fn. 5. AEP had calculated its POLR costs for the commission using a mathematical formula (called the "Black-Scholes model") that was created to price stock options. We held that contrary to the commission's finding, the formula did not reflect the costs to AEP to be the POLR. 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 25-30.

{¶ 9} The case was remanded to allow the commission the option to consider whether (1) "a non-cost-based POLR charge is reasonable and lawful" or (2) "it is appropriate to allow AEP to present evidence of its actual POLR costs." *Id.* at ¶ 30.

**B. Remand proceedings**

{¶ 10} On remand, the commission issued its May 25, 2011 order, directing that AEP file revised tariffs making the recovery of environmental-investment carrying costs and the POLR charge subject to refund as of the first billing cycle of June 2011. The order provided that if the commission ultimately determines that these charges are to be refunded to customers, interest may be imposed on the amounts collected by AEP in the interim.

{¶ 11} Following a five-day hearing, the commission issued its opinion and order on October 3, 2011. The commission determined that the environmental-investment carrying costs were lawful under R.C. 4928.143(B)(2)(d). *Remand Order* at 14-15. Because the commission approved the recovery of carrying costs, no refund was ordered of those that were collected during the remand proceedings.

{¶ 12} In addition, because the commission found that AEP had failed to submit any evidence of its actual POLR costs, it ordered AEP to remove the POLR charge from its tariffs. *Remand Order* at 22-24 and 33. And consistent with its May 25, 2011 order, it also directed AEP to refund to customers the

amount of the POLR charges collected during the remand proceedings (i.e., from the first billing cycle in June 2011 until the October 3, 2011 remand order). *Id.* at 33-34. The ESP was set to expire at the end of 2011, which was two months after the commission's remand order and two weeks after the final rehearing entry. As a result, AEP was able to collect nearly all of its POLR costs during the term of the ESP, except from June 2011 to December 2011 (the end of the ESP).

{¶ 13} During the remand proceedings, OCC and IEU had also requested that the commission allow customers to recover the POLR and environmental-investment carrying charges that AEP had collected from April 2009 through May 2011 (when those charges became subject to refund by order of the commission on remand). In the initial ESP proceedings, the commission had allowed AEP to phase in its rate increase by deferring the recovery of a portion of annual fuel costs incurred during the ESP period. Under this part of the plan, the balance of the deferred fuel costs remaining at the end of the ESP would be recovered with carrying charges from 2012 to 2018. *ESP Order* at 20-23. On remand, OCC and IEU argued that the commission should reduce the balance of the deferred fuel costs to be collected from customers by the amount of POLR and environmental-investment carrying costs collected, on the theory that those charges were not lawfully collected based on this court's rejection of them in the first ESP appeal.

{¶ 14} The commission, however, refused, reasoning that any adjustment of the deferred fuel-cost balance to account for the collection of the past charges would violate this court's prohibition against retroactive ratemaking. *Remand Order* at 35-36.

{¶ 15} OCC's and IEU's applications for rehearing were denied, and this appeal followed.

### III. STANDARD OF REVIEW

{¶ 16} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record,

the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a PUCO order on questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the PUCO's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *Id.*

**{¶ 17}** Although the court has "complete and independent power of review as to all questions of law" in appeals from the PUCO, *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we may rely on a state agency's expertise in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

## IV. DISCUSSION

**{¶ 18}** OCC and IEU challenge the commission's orders on two primary grounds: (1) the orders improperly authorized the recovery of carrying costs associated with environmental investments under R.C. 4928.143(B)(2)(d) and (2) the orders improperly denied the recovery of the POLR charges and environmental-investment carrying costs collected by AEP from April 2009 through May 2011. None of appellants' supporting arguments justify reversal.

**A.** **The commission's decision to permit recovery of carrying charges under R.C. 4928.143(B)(2)(d) was lawful and reasonable**

{¶ 19} In its first three propositions of law, IEU argues that the commission erred when it found that AEP could recover certain carrying costs associated with environmental investments pursuant to R.C. 4928.143(B)(2)(d). The following background is pertinent to resolving these claims.

{¶ 20} In the initial ESP proceedings, the commission permitted AEP to recover the incremental capital carrying costs on past environmental investments after January 1, 2009 (the beginning of the ESP period). AEP itself had made the environmental investments between 2001 and 2008, but they were not included in rates before the *ESP Order*. *See ESP Order* at 28. The commission, however, found that the carrying costs were recoverable during the ESP period under the broad language of R.C. 4928.143(B)(2), which states, "The [electric security] plan may provide for or include, without limitation, any of the following," and then lists nine categories of cost recovery. *See* R.C. 4928.143(B)(2)(a) through (i). On appeal, we reversed the commission's order on that point and remanded the matter for the commission's specific determination whether any of the nine categories listed in R.C. 4928.143(B)(2)(a) through (i) authorized the recovery. *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 31-35.

{¶ 21} On remand, the commission determined that R.C. 4928.143(B)(2)(d) permits AEP's recovery of carrying costs. *Remand Order* at 13-15. Subsection (d) provides that an ESP may include "[t]erms, conditions, or charges relating to * * * carrying costs * * * as would have the effect of stabilizing or providing certainty regarding retail electric service." In turn, R.C. 4928.01(A)(27) defines "retail electric service" as "any service involved in supplying or arranging for the supply of electricity to ultimate consumers in this state, from the point of generation to the point of consumption." According to the

commission, the record evidence demonstrated that the environmental-investment carrying costs "have the effect of providing certainty to both the Companies and their customers regarding retail electric service, specifically generation service." *Remand Order* at 14. The commission confirmed this finding on rehearing and further found that the carrying costs contribute to "stabilizing prices," which benefits AEP's customers. Nos. 08-917-EL-SSO and 08-918-EL-SSO, at 5-6 (Dec. 14, 2011) (the "*Remand Rehearing Entry*").

{¶ 22} On appeal, IEU devotes its first three propositions of law to arguing that the commission misstated the applicable law and the facts. We will address each claim in turn.

1. **The utility is not required to prove that charges are "necessary" in order to recover costs under R.C. 4928.143(B)(2)(d)**

{¶ 23} In proposition of law No. I, IEU contends that the commission misconstrued R.C. 4928.143(B)(2)(d)'s requirement that carrying costs "have the effect of stabilizing or providing certainty regarding retail electric service." IEU raises two challenges here: one legal (statutory interpretation) and one factual. We reject IEU's arguments for the reasons that follow.

a. **IEU has not demonstrated that R.C. 4928.143(B)(2)(d) imposes a "necessary" requirement**

{¶ 24} IEU offers a single challenge to the commission's interpretation of R.C. 4928.143(B)(2)(d), which allows an ESP to include "charges relating to * * * carrying costs * * * as would have the effect of stabilizing or providing certainty regarding retail electric service." IEU argues that for carrying costs to fit under the statute, AEP must demonstrate that the costs were necessary. IEU premises its argument entirely on the dictionary definition of "certainty," citing *Webster's Ninth New Collegiate Dictionary* 222-223 (1983). Relying on its preferred definition, IEU asserts that "certainty," as used in the statute, "denotes

8

that the retail electric service is made probable of occurrence, dependable, or reliable." Based on this definition, IEU asserts that AEP had the burden of showing that the carrying costs were "*necessary* to make it *probable* that customers would receive retail electric service." (Emphasis added.) Although it is not entirely clear, IEU appears to argue that AEP bears the burden of justifying the carrying charges, which required it to demonstrate that the provision of retail electric service would become less probable if the carrying costs were excluded from the ESP, i.e., that carrying costs are necessary. IEU has not demonstrated, however, that R.C. 4928.143(B)(2)(d) contains a necessity requirement.

{¶ 25} First, contrary to IEU's representations, the Webster's definition used by IEU does not define "certainty" in terms of "probability of occurrence."

{¶ 26} Second, and most importantly, the statute does not expressly require a showing of necessity. When interpreting a statute, a court must first examine the plain language of the statute to determine legislative intent. *Cleveland Mobile Radio Sales, Inc. v. Verizon Wireless*, 113 Ohio St.3d 394, 2007-Ohio-2203, 865 N.E.2d 1275, ¶ 12. The court must give effect to the words used, making neither additions nor deletions from words chosen by the General Assembly. *Id. See also Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 19. Certainly, had the General Assembly intended to require that electric-distribution utilities prove that carrying costs were "necessary" before they could be recovered, it would have chosen words to that effect.

{¶ 27} Third, IEU's argument otherwise finds no support in the statutory language. Although R.C. 4928.143(B)(2)(d) does not expressly require a showing of necessity, it does expressly impose a standard for recovery. The statute authorizes cost recovery through such "[t]erms, conditions, or charges * * * *as would have the effect of* stabilizing or providing certainty regarding retail electric service." (Emphasis added.) The critical problem for IEU is that it attempts to

prove its theory solely through the meaning of a single word in the statute—the word "certainty"—to the exclusion of all others. But the question is what R.C. 4928.143(B)(2)(d) means when read as a whole, and IEU never explains how the statute as a whole supports its position.

{¶ 28} In the context of IEU's argument, the word "necessary" denotes something that is essential, indispensable, or absolutely required. *See Webster's Third New International Dictionary* 1510-1511 (1986). Yet IEU never explains how the phrase "as would have the effect of stabilizing or providing certainty regarding retail electric service" imposes a necessity requirement. Indeed, it is anything but self-evident that this phrase requires the utility to show that carrying costs are necessary (absolutely required or indispensable) before they may be recovered. That is, nothing supports IEU's assertion that the utility must prove that the provision of retail electric service would be less probable (or certain) in order to recover costs under the statute.

{¶ 29} In the end, the commission's finding that R.C. 4928.143(B)(2)(d) does not require a showing of necessity is entitled to deference as an interpretation of a rate-related statutory provision if it is reasonable. *See In re Application of Columbus S. Power Co.*, 134 Ohio St.3d 392, 2012-Ohio-5690, 983 N.E.2d 276, ¶ 36-38. We find that it was. Therefore, we reject IEU's argument.

### b. The record supported authorization of the carrying charges under the requirements of R.C. 4928.143(B)(2)(d)

{¶ 30} IEU also contends in proposition of law No. I that the evidence before the commission did not support the legitimacy of the carrying costs under R.C. 4928.143(B)(2)(d). After review, we hold that IEU's evidentiary claim lacks merit.

{¶ 31} The commission found that the record supported the authorization of the carrying costs under R.C. 4928.143(B)(2)(d) as having the effect of

providing certainty to both AEP and its customers regarding retail electric service, specifically generation service. Citing the testimony of AEP witness Nelson, the commission found that the environmental-investment carrying costs allowed AEP to continue to provide low-cost generation power, which had the effect of lowering the price of retail electric service. Nelson did indeed testify to this. He testified that the environmental-investment carrying costs were necessary to allow AEP to keep its coal-fired generation plants running. Nelson explained that AEP had made significant capital investments in environmental improvements to its generating plants and that capital expenditures are typically long-lived assets that are recovered over the life of the asset. According to Nelson, the inclusion of carrying costs in the ESP compensated the company for the investment in its generating plants. He also testified that retail customers benefitted from the low-cost power generated from these plants because AEP passed those lower costs through to its customers.

{¶ 32} IEU, however, faults the commission for relying on Nelson's testimony, asserting that Nelson did not address the relevant question of whether the carrying charges would have the effect of making retail electric service more certain. According to IEU, "the availability of lower cost power does not support the finding" that the environmental investments (which gave rise to the carrying costs) "made the availability of the power more 'certain.'" But R.C. 4928.143(B)(2)(d) does not require a showing that the investment underlying the carrying costs makes "the availability of the power more certain." As already discussed, the statute requires only a showing that "[t]erms, conditions, or charges * * * have the effect of stabilizing or providing certainty regarding retail electric service." Nelson testified that the environmental-investment carrying charges were important to AEP's ability to provide generation power at a cost that was below the market rate for purchased power at that time, which in turn had the effect of lowering or stabilizing the price of retail electric service. Generation

11

falls within the definition of "retail electric service." *See* R.C. 4928.01(A)(27) (defining "retail electric service" as "any service involved in supplying or arranging for the supply of electricity to ultimate consumers in this state, from the point of generation to the point of consumption"). Thus, Nelson's testimony explicitly confirms what the commission found: that the carrying charges had the effect of providing certainty regarding retail electric service, specifically by providing reasonably priced electric-generation service.

{¶ 33} As a final matter, IEU contends that the commission ignored evidence that contradicted its finding that customers benefitted from the lower-cost power generated from AEP's coal-fired plants. IEU refers here to testimony from its executive director, Kevin M. Murray, describing how regional transmission organization PJM Interconnection[1] dispatches power to meet demand. IEU states that PJM—rather than AEP—is charged with dispatching generation power to meet the load of AEP's customers in AEP's service territory. IEU's point seems to be that AEP's customers do not benefit from the lower-cost power because AEP does not provide power generated from its own plants directly to its own customers.

{¶ 34} The commission, however, did not ignore Murray's testimony; it deemed his testimony irrelevant. According to the commission, the manner in which PJM dispatches power is not relevant, because AEP generally uses its own generating units to serve its customers and passes the benefit of the lower costs of power to AEP customers through reductions in the fuel-adjustment clause. IEU's claim that Murray's testimony on this subject was "unrefuted" is unfounded. The commission did cite other testimony as a basis to reject Murray's testimony.

---

1. PJM is a multiutility regional transmission organization designated by the Federal Energy Regulatory Commission to coordinate the movement of wholesale electricity in all or part of 13 states—including Ohio—and the District of Columbia. *See generally Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 384, 2006-Ohio-5853, 856 N.E.2d 940, ¶ 5-6.

{¶ 35} In the end, IEU asks the court to reweigh the evidence. But that is not our function on appeal. *See, e.g.*, *Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 39. As the commission's orders were amply supported by the record, we reject IEU's evidentiary claims.

### 2.     R.C. 4928.143(B)(2)(d) does not require an economic basis for recovery

{¶ 36} In proposition of law No. II, IEU asserts that to recover environmental-investment carrying costs under R.C. 4928.143(B)(2)(d), AEP must first show that its other revenues were insufficient to compensate it for providing generation service. Conceding that R.C. 4928.143(B)(2)(d) does not expressly require an economic justification as a prerequisite for authorizing cost recovery, IEU nevertheless avers that when the commission authorized the recovery of carrying costs on remand, it failed to abide by its "economic need" policy established in the *ESP Order.*

{¶ 37} IEU's position is premised on the part of the *ESP Order* that addressed two plans proposed by AEP to improve its distribution system. AEP had sought approval and cost recovery for a series of plans designed to modernize and improve its vegetation management, underground-cable maintenance, distribution automation,[2] and overhead-equipment inspection under R.C. 4928.143(B)(2)(h), which allows an ESP to include provisions regarding the utility's distribution service. *See ESP Order* at 30-34.

{¶ 38} The commission found, consistent with its prior decisions, that a distribution rider established pursuant to R.C. 4928.143(B)(2)(h) should be based on the electric utility's prudently incurred costs. *ESP Order* at 34. But contrary

---

2. Distribution automation is an advanced technology that improves service reliability by quickly identifying and isolating faulty distribution-line sections and remotely restoring service interruptions. *See generally* http://www.eeweb.com/blog/nicholas_abisamra/distribution-systems-automation-optimization-part-1 (accessed Feb. 7, 2014).

to IEU's claim, nothing suggests that the commission intended this policy to also apply to R.C. 4928.143(B)(2)(d). IEU points to no language in the *ESP Order* that this policy extends beyond the provisions for distribution-cost recovery in R.C. 4928.143(B)(2)(h). The commission did not mention R.C. 4928.143(B)(2)(d), and we decline IEU's invitation to read an economic-need policy into the language of that statute. Therefore, IEU's second proposition of law is denied.

### 3. IEU's claim regarding R.C. 4928.143(B)(1) is moot

{¶ 39} In proposition of law No. III, IEU maintains that the commission exceeded the scope of this court's remand instructions when it relied on R.C. 4928.143(B)(1) as "an alternative theory" to justify recovery of the carrying costs. We find it unnecessary to determine whether the commission erroneously relied on R.C. 4928.143(B)(1), because the commission was clearly authorized under R.C. 4928.143(B)(2)(d) to approve the carrying costs. Accordingly, we dismiss IEU's third proposition of law as moot. *See Armco, Inc. v. Pub. Util. Comm.*, 69 Ohio St.2d 401, 406, 433 N.E.2d 923 (1982) (this court does not indulge itself in advisory opinions).

### B. IEU has waived its challenge to the collection of carrying costs during the remand proceedings

{¶ 40} In proposition of law No. IV, IEU challenges the commission's decision to allow AEP to recover carrying costs during the remand proceedings. The commission had issued an order on May 25, 2011, allowing AEP to continue to collect these charges during the remand proceedings. The order made the collection of the charges subject to refund in the event that the commission found that they were not authorized by one of the categories of R.C. 4928.143(B)(2). This meant, according to IEU, that the commission allowed recovery of carrying costs during the remand period, i.e., after this court struck down the basis for their

14

recovery and before the commission authorized recovery on an alternate basis. Thus, recovery of those costs during the remand period was unauthorized by law.

{¶ 41} IEU failed to preserve this issue by not challenging the commission's May 25, 2011 order until November 2011, after the charges subject to refund had already been collected. By waiting six months to challenge the order, IEU deprived the commission of an opportunity to cure any error when it reasonably could have. The issue is therefore waived and will not be considered. *See, e.g.*, *Parma v. Pub. Util. Comm.*, 86 Ohio St.3d 144, 148, 712 N.E.2d 724 (1999) ("By failing to raise an objection until the filing of an application for rehearing, Parma deprived the commission of an opportunity to redress any injury or prejudice that may have occurred").

**C.** **The appellants have failed to show error in the orders denying the recovery of previously collected POLR charges**

{¶ 42} In its first and only proposition of law, OCC argues that the commission erred when it allowed AEP to retain the "unlawful" POLR charges that AEP collected from customers during the term of the ESP. In the *ESP Order*, the commission authorized a phase-in of AEP's rates during the ESP period by allowing AEP to defer a portion of its annual incremental fuel costs for recovery after the ESP expired. OCC argues that the commission erred when it refused to reduce the deferred-fuel-costs balance by an amount equal to the "unjustified" POLR charge. Likewise, IEU argues in proposition of law Nos. V through VII that the commission was required to reduce the deferred-fuel-costs balance in an amount equal to the unauthorized POLR charge.[3]

---

3. IEU also sought to reduce the deferred fuel costs by the amount of the environmental-investment carrying charges collected by AEP through May 2011, on the theory that those charges were unlawfully collected. *See In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 31-35. We have already held that AEP's recovery of carrying charges was authorized under R.C. 4928.143(B)(2)(d), rendering this claim moot.

**{¶ 43}** To understand appellants' arguments requires a review of the commission's approval of AEP's incurred fuel costs and deferred fuel costs in the *ESP Order*. Therefore, the following background is provided to place this issue in proper context.

1. **The commission's approval of the Fuel Adjustment Clause and deferral of fuel costs**

**{¶ 44}** ESPs may provide for "[a]utomatic recovery" of "the cost of fuel used to generate the electricity supplied under the [standard service] offer," "provided the cost is prudently incurred." R.C. 4928.143(B)(2)(a). The Fuel Adjustment Clause ("FAC") is a mechanism that provides for a separate charge from the base rate that will automatically adjust as the cost of fuel fluctuates. If fuel costs rise, the base rate will stay the same, but the FAC will rise automatically without a new rate case. *ESP Order* at 14-15, 18-19.

**{¶ 45}** It is important to remember that no matter how the baseline was calculated, only actual fuel costs will be recovered. *See In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 66. The FAC mechanism includes quarterly adjustments to reconcile actual fuel costs incurred, which establishes the new charge for the following quarter. The FAC mechanism also requires an annual prudency and accounting review. These are designed to control for any over- or underrecoveries that may occur within a particular quarter. *ESP Order* at 14-15.

**{¶ 46}** In the *ESP Order*, the commission established caps on how much AEP could increase its rates each plan-year to ensure rate stability and to mitigate the impact on customers. *ESP Order* at 22. R.C. 4928.144 authorizes "any just and reasonable phase-in of any electric distribution utility rate * * * as the commission considers necessary to ensure rate or price stability for consumers." Under the rate caps, AEP could increase its bills only by a set percentage each year. During the term of the ESP, AEP deferred for future collection a portion of

the annual incremental FAC costs (i.e., fuel costs) that exceeded the rate caps. In short, amounts earned during each year of the ESP but not collected would be placed into a "deferral" account and, as required by statute, accrue "carrying charges," a type of financing charge added to them. *See* R.C. 4928.144; *ESP Order* at 22.

### 2. The appellants' proposed remedy violates the rule against retroactive ratemaking

{¶ 47} On appeal, OCC and IEU challenge the commission's decision to refuse to adjust the FAC deferral balance. OCC and IEU seek a reduction in the FAC deferral in the amount of $368 million, the amount of POLR costs collected by AEP from April 2009 through May 2011. OCC and IEU both characterize their proposed adjustment of the FAC deferral balance as a prospective offset of revenues deferred for future collection.[4]

{¶ 48} OCC and IEU effectively ask the court to direct the commission to order a refund of the POLR revenues that AEP had already collected from customers during the ESP term—specifically from April 2009 through May 2011. Their theory is that the charges were not lawfully collected because this court rejected the POLR charge in the first ESP appeal, as did the commission on remand. We hold, however, that the law does not require recovery of the POLR charges. Granting appellants' request would constitute retroactive ratemaking.

### a. R.C. Title 49 forbids retroactive ratemaking

{¶ 49} Seeking to recover excessive rates charged during the appeal of a commission order is exactly the action this court found contrary to law in *Keco Industries,* 166 Ohio St. 254, 141 N.E.2d 465, paragraph two of the syllabus (R.C. Title 49 "affords no right of action for restitution of the increase in charges

---

4. The commission has approved a mechanism for AEP to collect the deferred fuel costs (the deferred FAC balance) with carrying charges, so the revenues at issue are currently being collected. *See In re Application of Columbus S. Power Co. for Approval of Mechanism to Recover Deferred Fuel Costs*, Pub. Util. Comm. No. 11-4920-EL-RDR (Aug. 1, 2012).

collected during the pendency of the appeal"). Likewise, in *Lucas Cty. Commrs. v. Pub. Util. Comm.*, 80 Ohio St.3d 344, 348, 686 N.E.2d 501 (1997), the court ruled that "utility ratemaking * * * is prospective only" and that R.C. Title 49 "prohibit[s] customers from obtaining refunds of excessive rates that may be reversed on appeal." Moreover, the court has consistently applied *Keco* and refused to grant refunds in appeals from commission orders. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 121 Ohio St.3d 362, 2009-Ohio-604, 904 N.E.2d 853, ¶ 21, citing *Keco* ("any refund order would be contrary to our precedent declining to engage in retroactive ratemaking"); *Green Cove Resort I Owners' Assn. v. Pub. Util. Comm.*, 103 Ohio St.3d 125, 2004-Ohio-4774, 814 N.E.2d 829, ¶ 27 ("Neither the commission nor this court can order a refund of previously approved rates, * * * based on the doctrine set forth in *Keco* * * *"). These cases teach that present rates may not make up for excessive rate charges due to regulatory delay, which is exactly what OCC and IEU are seeking here.

### b. Appellants' theory that the POLR charge was unlawfully collected is wrong

{¶ 50} As noted, appellants seek to recover charges that were already collected in rates on the theory that the charges were not lawful based on this court's rejection of the POLR charge in the first ESP appeal and on the commission's similar rejection of the POLR charge on remand. More specifically, OCC and IEU argue that the phase-in of rates in the ESP was not "just and reasonable," as required by R.C. 4928.144, because the deferred FAC balance was calculated in part on the unlawful POLR revenues collected by AEP. *See* R.C. 4928.144 (authorizing the commission to order "any just and reasonable phase-in of any electric distribution utility rate * * * as the commission considers necessary to ensure rate or price stability for consumers"). And the remedy, according to appellants, is to deduct the unlawful POLR revenues from the deferred FAC balance that would otherwise be charged to customers.

**{¶ 51}** There is no basis, however, for appellants to claim that the POLR charges that were collected from April 2009 to May 2011 were "unlawful." *Keco* holds that rates set by the commission are lawful until such time as this court later finds that the commission erred in setting that particular rate. *Keco*, 166 Ohio St. at 259, 141 N.E.2d 465. *See also Lucas Cty. Commrs. v. Pub. Util. Comm.*, 80 Ohio St.3d at 347, 686 N.E.2d 501 ("while a rate is in effect, a public utility must charge its consumers in accordance with the commission-approved rate schedule"). Moreover, a remand order of this court does not automatically render the existing rates unlawful, as "the rate schedule filed with the commission remains in effect until the commission executes this court's mandate by an appropriate order." *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 46 Ohio St.2d 105, 346 N.E.2d 778 (1976), paragraph two of the syllabus (holding that a decision of this court to reverse and remand an order of the commission "does not reinstate the rates in effect before the commission's order or replace that rate schedule as a matter of law, but is a mandate to the commission to issue a new order").

**{¶ 52}** We reversed the POLR charge on April 19, 2011. *In re Application of Columbus S. Power*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655. On remand, the commission ordered that POLR charges not yet collected would be subject to refund as of the first billing cycle of June 2011. *Remand Order* at 39. When the commission issued its remand order, it directed AEP to refund the POLR charges collected during the remand proceedings. *Id.* at 34. Thus, the deferred FAC balance—which was calculated during the ESP term (2009-2011)—was not derived from "unlawful" POLR charges, as the appellants contend.

**c.**      **The existence of the FAC deferral balance is of no avail to appellants in this case**

**{¶ 53}** Appellants contend that the existence of the deferred FAC balance creates a mechanism that allows for prospective rate adjustments to fully remedy the POLR overcharges, without running afoul of the prohibition against retroactive ratemaking. We disagree.

**{¶ 54}** The fact that the deferred fuel costs may provide a mechanism to adjust rates prospectively does not alter the nature of appellants' requested remedy. The appellants are seeking to recover—through an adjustment to current rates—POLR charges that already have been collected from customers and later were found to be unjustified. The rule against retroactive ratemaking, however, is clear: present rates may not make up for revenues lost due to regulatory delay. *In re Application of Columbus S. Power Co.* at ¶ 10-11.

**d.**      **The court lacks jurisdiction over the appellants' ratemaking and accounting arguments**

**{¶ 55}** OCC claims that any adjustment to the deferred fuel costs does not result in retroactive ratemaking because the commission was not engaged in ratemaking when it established the FAC mechanism and FAC deferral balance. In a similar vein, OCC and IEU maintain that the commission was not engaged in ratemaking because the FAC deferral component was only an accounting mechanism. The appellants have forfeited these claims by failing to present them to the commission on rehearing. That failure jurisdictionally bars the court from considering them. *See* R.C. 4903.10; *Consumers' Counsel v. Pub. Util. Comm.*, 70 Ohio St.3d 244, 247, 638 N.E.2d 550 (1994) (citing cases). *See also Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 59 ("when an appellant's grounds for rehearing fail to specifically allege in what respect the PUCO's order was unreasonable or unlawful, the requirements of R.C. 4903.10 have not been met").

### e. The appellants failed to avail themselves of the only remedy available to them: a stay under R.C. 4903.16

{¶ 56} AEP collected $368 million in POLR charges during the ESP, without any evidence that would justify the cost recovery. But under *Keco*'s no-refund rule, AEP is permitted to keep it, resulting in a windfall for AEP. While we recognize that this particular outcome is unfair, as we noted in *Columbus S. Power*, any unfairness must be viewed in the context of the larger legislative scheme:

> As *Keco* and other cases have noted, the statutes protect against unlawfully high rates by allowing stays. R.C. 4903.16 authorizes the court to stay execution of commission orders. * * * This section makes "clear that the General Assembly intended that a public utility shall collect the rates set by the commission's order, giving, however, to any person who feels aggrieved by such order a right to secure a stay of the collection of the new rates after posting a bond." *Keco*, 166 Ohio St. at 257, 2 O.O.2d 85, 141 N.E.2d 465. The stay remedy "completely abrogated" the form of refund (a restitution order) sought in that case. *Id*. at 259.

*Columbus S. Power*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 17.

{¶ 57} Critical for both OCC and IEU is that they failed to obtain such a stay from this court in the first ESP appeal, at a time when the POLR charges were being collected.[5] OCC and IEU do not address R.C. 4903.16, let alone offer an argument against its application.

---

5. Before filing the instant appeal, OCC attempted to stay the collection of the ESP rates, filing an action in prohibition, an action in procedendo, a premature appeal, and a motion to suspend the ESP order. The difficulty for OCC is that it failed to seek a bond, as required by R.C. 4903.16.

**D.**     **The rule against retroactive ratemaking bars adjustments in this case to delta revenues, the Universal Service Fund rates, and the significantly-excessive-earnings test**

{¶ 58} In proposition of law No. VIII, IEU claims that in addition to reducing the deferred-fuel-costs balance by the POLR, the commission was required to make downward adjustments in other areas due to AEP's unlawful recovery of POLR revenues. IEU identifies delta revenues, Universal Service Fund ("USF") amounts, and the significantly-excessive-earnings test ("SEET"), as areas that it believes warrant additional adjustments.[6]

{¶ 59} IEU's theory is that the unlawful POLR charges are "embedded" in AEP's collection of delta revenues, USF charges, and annual ESP earnings, causing these revenues to be overstated. We have already rejected IEU's theory that the POLR charges were unlawful. Therefore, we dismiss IEU's proposition of law No. VIII.

---

*See In re Application of Columbus S. Power Co.,* 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 18-19.

6. Delta revenues are derived from discounted rate arrangements under R.C. 4905.31. Delta revenue refers to the amount of the discount: it is the difference between what the utility would have collected under its tariffs and what it actually collected under the discounted rate. *See* Ohio Adm.Code 4901:1-38-01(C). Delta revenue may be recovered (in whole or in part) from all other customers. *See* R.C. 4905.31(E) (allowing utility to recover costs, including "revenue foregone," as a result of a discounted rate arrangement). Somewhat similarly, the USF provides bill-payment assistance to low-income residential consumers, and other consumers pay USF charges to make the utility whole. R.C. 4928.51; *Constellation NewEnergy, Inc. v. Pub. Util. Comm.,* 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 28, fn. 4.

As to the SEET, under R.C. 4928.143(F), electric distribution utilities are required to undergo an annual earnings review. If their ESP resulted in "significantly excessive earnings" compared to similar companies, the utility must return the excess to customers. *See, e.g., In re Application of Columbus S. Power Co.*, 134 Ohio St.3d 392, 2012-Ohio-5690, 983 N.E.2d 276 (the court's review of AEP's SEET for 2009).

### V. CONCLUSION

{¶ 60} In summary, we hold that OCC and IEU have not carried their burden of showing reversible error in the commission's remand orders. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 125 Ohio St.3d 57, 2010-Ohio-134, 926 N.E.2d 261, ¶ 42 and ¶ 73. Therefore, we affirm the commission's orders.

Orders affirmed.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, and FRENCH, JJ., concur.

PFEIFER and O'NEILL, JJ., dissent.

_____

**PFEIFER, J., dissenting.**

{¶ 61} On remand, the PUCO has determined that AEP did not present evidence of its Provider of Last Resort ("POLR") costs. The PUCO stated that the $368 million in POLR revenues that AEP had collected from customers was "unjustified." Nevertheless, the PUCO asserted that a refund under the circumstances would be tantamount to retroactive ratemaking, something it is not authorized to engage in. *See Lucas Cty. Commrs. v. Pub. Util. Comm.*, 80 Ohio St.3d 344, 348, 686 N.E.2d 501 (1997).

{¶ 62} It is unconscionable that a public utility should be able to retain $368 million that it collected from consumers based on assumptions that are unjustified. The problem stems from this court's 1957 decision that determined that "[w]here the charges collected by a public utility are based upon rates which have been established by an order of the Public Utilities Commission of Ohio, the fact that such order is subsequently found to be unreasonable or unlawful on appeal to the Supreme Court of Ohio, in the absence of a statute providing therefor, affords no right of action for restitution of the increase in charges collected during the pendency of the appeal." *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 141 N.E.2d 465 (1957), paragraph two of the syllabus. Clearly the time has come to overturn this case.

{¶ 63} R.C. 4905.32, the statute on which the *Keco* decision is based, does not state that there is "no right of action for restitution of the increase in charges collected during the pendency of the appeal." In my view, that part of the opinion is mere dicta, foolhardy, erroneous, and not binding on this court. Indeed, it boggles the mind that this court would ever countenance such a proposition: that a public utility should be allowed to fatten itself on the backs of Ohio residents by collecting unjustified charges.

{¶ 64} In this case, we are talking about $368 million in unjustified charges that, instead of redounding to the people who paid them, reside in the coffers of a *public* utility without the justification of actual costs. This illusory charge will become pure unwarranted profit based on this court's decision today. And it does not have to be this way.

{¶ 65} *Keco* should be overturned. Charges that are approved by the PUCO but that do not withstand challenge in this court ought to be subject to restitution.

{¶ 66} A public utility ought not to receive unjust enrichment based on charges that in the context of this case as determined by the PUCO, clearly should not have been approved. R.C. 4905.32 states that utilities cannot refund a rate that has been charged pursuant to the rate schedule filed with the PUCO. It does not say that this court cannot compel a utility to provide restitution for charges that it has unjustifiably collected. A practical way to unwind this case so that it does not shock the utility and its investors is to set off the unjustifiable collections against future charges. The Ohio Consumers' Counsel has suggested that a direct setoff against the deferred fuel-cost rider is an appropriate way for Columbus Southern to provide restitution.

{¶ 67} Allowing AEP to retain the $368 million that it collected based on charges that were not justified is unconscionable. Doing so because of a 50-year-

old case that is not supported by the statute on which it is based is ridiculous. The ratepayers of Ohio deserve better. I dissent.

O'NEILL, J., concurs in the foregoing opinion.

_____

Bruce J. Weston, Consumers' Counsel, and Maureen R. Grady and Terry L. Etter, Assistant Consumers' Counsel, for appellant Ohio Consumers' Counsel.

McNees, Wallace & Nurick, L.L.C., Samuel C. Randazzo, Frank P. Darr, and Joseph E. Oliker, for appellant Industrial Energy Users-Ohio.

Michael DeWine, Attorney General, and William L. Wright, Werner L. Margard III, and John H. Jones, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Steven T. Nourse and Matthew J. Satterwhite; and Porter, Wright, Morris & Arthur, Kathleen M. Trafford, and Daniel R. Conway, for intervening appellee, Ohio Power Company.

_____