[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of E. Ohio Gas Co.,* Slip Opinion No. 2023-Ohio-3289.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-3289

IN RE APPLICATION OF EAST OHIO GAS COMPANY D.B.A. DOMINION ENERGY OHIO FOR APPROVAL OF AN ALTERNATIVE FORM OF REGULATION TO ESTABLISH A CAPITAL EXPENDITURE PROGRAM RIDER MECHANISM; OFFICE OF THE OHIO CONSUMERS' COUNSEL ET AL., APPELLANTS; PUBLIC UTILITIES COMMISSION, APPELLEE; EAST OHIO GAS COMPANY D.B.A. DOMINION ENERGY OHIO, INTERVENING APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of E. Ohio Gas Co.,* Slip Opinion No. 2023-Ohio-3289.]

*Public utilities—R.C. 4929.05(A)—R.C. 4929.111(C)—Alternative rate plan—Rate of return for natural-gas company's alternative rate plan is just and reasonable based on company's last base-rate case—Orders affirmed.*

(No. 2022-0458—Submitted May 3, 2023—Decided September 20, 2023.)

APPEAL from the Public Utilities Commission, No. 19-468-GA-ALT.

_____

**STEWART, J.**

{¶ 1} Appellee, the Public Utilities Commission of Ohio, issued an opinion and order approving a stipulation (or settlement) that authorizes intervening appellee, East Ohio Gas Company d.b.a. Dominion Energy Ohio ("Dominion"), to implement its Capital Expenditure Program Rider (the "CEP Rider"). Following a rehearing, the commission filed an entry modifying the earlier order. Appellants, Office of the Ohio Consumers' Counsel ("OCC") and Northeast Ohio Public Energy Council ("NOPEC"), have appealed. Broadly speaking, appellants argue that the commission (1) erred in approving the rate of return applicable to the CEP Rider, (2) engaged in improper ex parte communications with its staff, and (3) misapplied the standard for assessing the reasonableness of the stipulation. Because we conclude, upon consideration of the record, that the commission's orders are not unlawful or unreasonable, we affirm them.

## I. BACKGROUND

{¶ 2} Ohio law authorizes a natural-gas company to apply to the commission for approval to "implement a capital expenditure program" for certain enumerated purposes. R.C. 4929.111(A). Beginning in 2012, the commission issued a series of orders authorizing Dominion to implement a capital-expenditure program and defer post-in-service carrying costs, depreciation expenses, and property-tax expenses associated with its capital-expenditure-program investments. *See In re Application of E. Ohio Gas Co.*, Pub. Util. Comm. Nos. 11-6024-GA-UNC and 11-6025-GA-AAM, 2012 Ohio PUC LEXIS 852 (Dec. 12, 2012); *In re Application of E. Ohio Gas Co.*, Pub. Util. Comm. Nos. 12-3279-GA-UNC and 12-3280-GA-AAM, 2013 Ohio PUC LEXIS 221 (Oct. 9, 2013); *In re the Application of E. Ohio Gas Co.*, Pub. Util. Comm. Nos. 13-2410-GA-UNC and 13-2411-GA-AAM, 2014 Ohio PUC LEXIS 151 (July 2, 2014). None of these orders authorized Dominion to recover the costs of its capital-expenditure programs. Rather,

Dominion would have to seek approval to recover its costs in a future proceeding. *See id.* *9.

{¶ 3} In May 2019, Dominion filed an application to recover the costs of its capital-expenditure program by establishing the CEP Rider. Dominion styled its application as a request for approval of an alternative rate plan. *See* R.C. 4929.05(A) ("A natural gas company may request approval of an alternative rate plan by filing an application under section 4909.18 of the Revised Code, regardless of whether the application is for an increase in rates"). An "alternative rate plan" is a "method, alternate to the method of section 4909.15 of the Revised Code, for establishing rates and charges." R.C. 4929.01(A). Among other things, R.C. 4909.15(A)(2) requires that the commission determine a "fair and reasonable rate of return" to the utility when "fixing and determining just and reasonable rates, fares, tolls, rentals, and charges."

{¶ 4} In its application, Dominion proposed a 9.91 percent rate of return for the CEP Rider based on the rate of return that the commission authorized in Dominion's most recent base-rate case,[1] which was decided in 2008. *See In re Application of E. Ohio Gas Co.*, Pub. Util. Comm. Nos. 07-829-GA-AIR, 07-830-GA-ALT, 07-831-GA-AAM, 08-169-GA-ALT, and 06-1453-GA-UNC, 2008 Ohio PUC LEXIS 655 (Oct. 15, 2008). The rate of return is one of many components Dominion used to calculate the costs that it proposed to collect under the CEP Rider.

{¶ 5} The commission's staff issued a report recommending that the commission approve the application. Dominion and the commission's staff thereafter jointly filed a stipulation asking the commission to approve the

---

1. A base-rate case is a "formal proceeding before a utility regulatory body in which a utility files an application to increase its distribution rate. The distribution rate is simply * * * the cost to deliver * * * natural gas * * * to customers." Public Utilities Commission of Ohio, *What is a distribution rate case?*, https://puco.ohio.gov/news/news-bureau-what-is-a-rate-case (accessed June 1, 2023) [https://perma.cc/2QA8-5JPN].

application subject to the staff's recommendations in its report, except where the stipulation specified otherwise. The stipulation retained the 9.91 percent rate of return that Dominion had proposed in its application.

{¶ 6} OCC asked the commission to either reject or modify the stipulation; NOPEC asked the commission to reject it. Relevant here, appellants' witness, Dr. Daniel Duann, who is the assistant director of analytical services with OCC, testified that a 9.91 percent rate of return was unreasonably high and outdated in light of current market conditions. Dr. Duann advocated that the commission use data from 2019 and 2020 to achieve a 7.20 percent rate of return rather than use the rate of return from Dominion's 2008 base-rate case.

{¶ 7} The commission modified and approved the stipulation. In doing so, the commission ordered Dominion to file a new base-rate case by October 2023 rather than October 2024. The commission noted that "Dominion [could not] deny, that, since the approval of its last base rate case in 2008, the Company's cost of debt initially dropped from 6.50 percent to 4.23 percent and [that], currently, its cost of debt is 2.25 percent." Dominion's filing of a new base-rate case, the commission reasoned, would create a "more expedient alignment of the Company's cost of capital and capital structure with market conditions." Even so, the commission approved the stipulated 9.91 percent rate of return, citing its practice of applying the rate of return approved in a utility's most recent base-rate case to the utility's later alternative-rate-plan and rider proceedings. The parties do not dispute that with the commission's approval of the stipulation, Dominion will recover approximately $73 million through the CEP Rider.

{¶ 8} In approving the stipulation, the commission's chairwoman stated at the commission's December 30, 2020 public meeting: "I just want to give a big shout out to [the director of rates and analysis] and her staff because without her and their help, this case probably would've taken even longer, and I just want to really thank her for her attentiveness and working with commissioners and better

4

understanding everything in the case and how it came about." Public Utilities Commission Meeting of December 30, 2020, available at https://www.youtube.com/watch?v=d_ozIp9-4tQ (accessed June 1, 2023). Another commissioner responded that he "echo[ed] [the chairwoman's] comments 100 percent." *Id.*

{¶ 9} Appellants filed a joint application for rehearing that not only challenged the opinion and order but also asserted that one could infer from the commissioners' statements at the public meeting that the commission had engaged in improper ex parte communications with its staff in violation of R.C. 4903.081 and Ohio Adm.Code 4901-1-09. Appellants thus asked the commission to "explain[] on rehearing to what extent, if at all, the merits of this case were part of the communications referenced in the Commissioner's remarks when the order was signed." In a second entry on rehearing, the commission stated that it had done nothing improper. This appeal followed.

## II. ANALYSIS

{¶ 10} "R.C. 4903.13 provides that a [commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. However, this court has "complete and independent power of review as to all questions of law." *Canton Storage & Transfer Co. v. Pub. Util. Comm.*, 72 Ohio St.3d 1, 4, 647 N.E.2d 136 (1995). But we do not "reweigh the evidence or second-guess the [commission] on questions of fact." *In re Complaints of Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 152 Ohio St.3d 73, 2017-Ohio-7566, 93 N.E.3d 902, ¶ 35.

{¶ 11} In this case, the commission partly relied on the following three-part test as set forth in *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 110 Ohio St.3d 394, 2006-Ohio-4706, 853 N.E.2d 1153, ¶ 16, to evaluate the reasonableness of the

contested stipulation: "[W]hether the settlement is a product of serious bargaining among capable, knowledgeable parties; whether the settlement, as a package, benefits ratepayers and the public interest; and whether the settlement package violates any important regulatory principles or practices." This court has endorsed the commission's use of this test. *In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, ¶ 39. Appellants' arguments are based on the three parts of this test.

*A. Arguments concerning the rate of return*

**1. The commission did not violate an important regulatory principle in adopting the 9.91 percent rate of return**

{¶ 12} In their first proposition of law, appellants attack the commission's adoption of a 9.91 percent rate of return instead of a 7.20 percent rate of return. In their view, the 9.91 percent rate of return, which stems from the commission's decision in Dominion's 2008 base-rate case, contravenes the important regulatory principle that a utility's rate of return must be based on current market conditions. Appellants point to several statutes, a commission rule, and two decisions (one from this court and one from the United States Supreme Court) in support of their argument. As explained below, we reject appellants' first proposition of law because none of their cited authority requires the commission to establish a rate of return based on current market conditions in this case. *See Ohio Consumers' Counsel v. Pub. Util. Comm.*, 125 Ohio St.3d 57, 2010-Ohio-134, 926 N.E.2d 261, ¶ 20 (rejecting the appellants' argument that the commission violated the regulatory principle of gradualism because they "cited no authority that gradualism is a factor that the commission is required to apply in every rate-design case"). We begin by considering the several statutes and the rule that appellants cite, then turn to the case law they rely on.

### a. R.C. 4929.05

{¶ 13} R.C. 4929.05(A) authorizes a natural-gas company to seek the commission's approval of an alternative rate plan. Although one requirement for approval is that the alternative rate plan be "just and reasonable," R.C. 4929.05(A)(3), nothing in the statute requires that a just and reasonable rate of return be based on current market conditions as appellants argue. The absence of the phrase "current market conditions" from the statute—as well as the other statutes and the rule discussed below—is significant. In matters of statutory interpretation, this court cannot insert or delete words. *In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, ¶ 26.

### b. R.C. 4929.02

{¶ 14} Another requirement for approval of an alternative rate plan is the expectation that the natural-gas company "continue to be in substantial compliance with the policy of this state specified in section 4929.02 of the Revised Code." R.C. 4929.05(A)(2). R.C. 4929.02(A)(1) provides that the policy of this state is to "[p]romote the availability to consumers of adequate, reliable, and reasonably priced natural gas services and goods." Appellants seem to argue that a natural-gas service is reasonably priced only when the rate of return is based on current market conditions. But nothing in R.C. 4929.02 requires that a rate of return be based on current market conditions.

### c. R.C. 4929.111(C)

{¶ 15} R.C. 4929.111(C) requires that to approve an application for a capital-expenditure program, the commission find that "the capital expenditure program is consistent with the natural gas company's obligation under [R.C. 4905.22] to furnish necessary and adequate services and facilities." Nothing in this passage states that a rate of return must be based on current market conditions. Nor is it significant that R.C. 4929.111(C) incorporates R.C. 4905.22, because R.C.

7

4905.22 also does not specify that the commission must adopt a rate of return based on current market conditions.

### d. R.C. 4909.18

{¶ 16} A natural-gas company that seeks approval of an alternative rate plan may file an application under R.C. 4909.18. R.C. 4929.05(A). Appellants assert that the filing requirements set forth in R.C. 4909.18 help ensure that rates are just and reasonable. Yet, nothing in R.C. 4909.18 requires that a rate of return be based on current market conditions. Rather, the statute speaks to what a natural-gas company must include in its application when seeking approval of an alternative rate plan. *See* R.C. 4909.18(A) through (D).

### e. Ohio Adm.Code 4901:1-19-06

{¶ 17} Ohio Adm.Code 4901:1-19-06 prescribes filing requirements for alternative-rate-plan applications. Appellants assert that the rule requires an applicant to submit information bearing "on its current long-term cost of debt and current cost of equity, upon which to calculate a current overall rate of return." Yet, appellants do not point to anything in the rule that requires the commission to find a rate of return based on current market conditions.

### f. Case law

{¶ 18} Appellants rely on *Babbit v. Pub. Util. Comm.*, 59 Ohio St.2d 81, 391 N.E.2d 1376 (1979), and *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm. of West Virginia*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), as further support for their position that the commission must adopt a rate of return based on current market conditions.

{¶ 19} In *Babbit*, this court spoke to the necessity of "bas[ing] rate of return calculations on current data" and ensuring that the rate of return "be prospective." *Id.* at 93. But this court made these statements in the context of interpreting R.C. 4909.15(A)(2)'s reference to a "fair and reasonable rate of return." This case does not turn on how this court construed R.C. 4909.15(A)(2) in *Babbit*, because an

alternative rate plan, by definition, is a method "alternate to the method of section 4909.15 of the Revised Code for establishing rates and charges," R.C. 4929.01(A).

{¶ 20} The question presented in *Bluefield* was whether rates prescribed in a state's utilities-commission order were so low as to be confiscatory, such that enforcement of the rate order "deprive[d] the public utility company of its property in violation of the Fourteenth Amendment" to the United States Constitution. *Id.* at 690. In analyzing this question, the United States Supreme Court announced principles that a state's utilities commission should account for when setting a rate of return—among them, that a utility's return should be "equal to that generally being made at the same time and in the same general part of the country in other business undertakings" that share "corresponding risks and uncertainties." *Id.* at 692. Appellants ask us to follow that principle in this case, but this case does not involve a confiscation claim.

### 2. The commission did not inconsistently apply its precedent

{¶ 21} Appellants next argue that the commission inconsistently applied its precedent in adopting a 9.91 percent rate of return. This court has "instructed the commission to 'respect its own precedents in its decisions to assure the predictability which is essential in all areas of the law, including administrative law.' " *In re Complaint of Suburban Natural Gas Co.*, 162 Ohio St.3d 162, 2020-Ohio-5221, 164 N.E.3d 425, ¶ 29, quoting *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 42 Ohio St.2d 403, 431, 330 N.E.2d 1 (1975), *superseded on other grounds by statute as recognized in Babbit*, 59 Ohio St.2d 81, 391 N.E.2d 1376. The commission did not depart from this instruction. The commission asserted that it set the rate of return according to its self-described long-standing practice to utilize the last approved rate of return in a utility's rate case in subsequent alternative regulation and rider proceedings. In support, the commission pointed to a line of its own decisions from the natural-gas arena. One of those decisions involved a situation remarkably similar to the one presented here: a natural-gas company's

request to implement a CEP Rider. *See In re Application of Columbia Gas of Ohio, Inc.*, Pub. Util. Comm. No. 17-2202-GA-ALT, 2018 Ohio PUC LEXIS 1188, *6 (Nov. 28, 2018).

{¶ 22} According to appellants, however, the commission inconsistently applied *In re Application of Columbia Gas* to this case. They contend that the commission initially determined in a procedural entry that it would not follow its decision in *In re Application of Columbia Gas* but then reversed course without any explanation. Dominion correctly points out that appellants did not articulate this argument in their rehearing application. But even on the merits, this argument is unavailing because appellants mischaracterize what the commission did in its procedural entry. The entry on which appellants rely was filed on June 19, 2019; it dealt with Dominion's request to waive certain filing requirements at an early stage of the proceedings. Contrary to appellants' assertions, the commission did not discuss the merits of adopting Dominion's requested rate of return in that entry, nor did it discuss whether to apply its decision in *In re Application of Columbia Gas* to this case.

{¶ 23} Lastly, appellants cite three commission decisions that they contend cut against the approach applied by the commission below: *In re Application of Columbus S. Power Co.*, Pub. Util. Comm. No. 05-1194-EL-UNC, 2005 PUC LEXIS 655 (Dec. 15, 2005); *In re Application of Columbus S. Power Co.*, Pub. Util. Comm. No. 10-155-EL-RDR, 2010 Ohio PUC LEXIS 1083 (Oct. 22, 2010); and *In re Application of Cleveland Elec. Illum. Co.*, Pub. Util. Comm. Nos. 81-146-ET-AIR and 81-1565-EL-UNC, 1982 Ohio PUC LEXIS 7 (Mar. 17, 1982). In appellants' view, these cases stand for the general proposition that the better practice is to use recent data when calculating a rate of return, especially when the utility's financial conditions have changed. Notably, appellants cite these decisions for the first time in their reply brief. Although we earlier denied Dominion's motion to strike appellants' discussion of these decisions, *see* 169 Ohio St.3d 1438, 2023-

10

Ohio-482, 203 N.E.3d 725, we now disregard appellants' reliance on these three decisions because they are used in support of an argument that was raised for the first time in their reply brief. *See State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 18 (faulting a party for failing to address "dispositive issues" until the filing of the party's reply brief). In summary, we conclude that appellants have not shown that the commission inconsistently applied its precedent.

### 3. The commission did not violate R.C. 4903.09

{¶ 24} Appellants also assert that the commission violated R.C. 4903.09 when it adopted a rate of return from a prior proceeding rather than making an independent finding from the record. The statute provides that the commission must file "findings of fact and written opinions setting forth the reasons prompting the decision[] arrived at, based upon said findings of fact." *Id.* Although "strict compliance" with R.C. 4903.09 is not required, *Tongren v. Pub. Util. Comm.*, 85 Ohio St.3d 87, 89, 706 N.E.2d 1255 (1999), the commission "must show, in sufficient detail, the facts in the record upon which the order is based, and the reasoning followed by the [commission] in reaching its conclusion," *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 32 Ohio St.3d 306, 312, 513 N.E.2d 337 (1987).

{¶ 25} The commission's opinion and order at issue here contains sufficient facts regarding the 9.91 percent rate of return. The opinion and order cited five sources that bear on that figure: (1) Dominion's application, (2) the testimony of Dominion's regulatory and pricing director, who sponsored the stipulation at the commission hearing, (3) a report prepared by a third-party consultant, (4) the hearing transcript, and (5) Dominion's last base-rate case.

{¶ 26} The commission's reasoning is also sufficiently detailed. The opinion and order stated that the commission was adhering to its "long-standing practice to utilize the last approved rate of return in a utility's rate case in subsequent alternative regulation and rider proceedings." In support of this

statement, the commission cited a line of its own decisions involving natural-gas companies, including *In re Columbia Gas of Ohio, Inc.*, Pub. Util. Comm. No. 17-2202-GA-ALT, 2018 Ohio PUC LEXIS 1188.

{¶ 27} Appellants' reliance on *In re Application of FirstEnergy Advisors for Certification as a Competitive Retail Elec. Serv. Power Broker & Aggregator*, 166 Ohio St.3d 519, 2021-Ohio-3630, 188 N.E.3d 140, does not require a different result. In that case, the commission approved a company's application to provide regulated utility services without making the required findings under R.C. 4903.09 and Ohio Adm.Code 4901:1-24-10(C)(1) and (2) that the company was fit to provide the services. Instead, the commission pointed to a report prepared by its staff in which the staff merely stated that the company had provided requested information, that it had reviewed the information, and that in its view the company met all requirements for approval of its application. This court held that the commission's failure to explain in its order how the company was fit to provide regulated utility services and the lack of any citation to the record constituted a violation of R.C. 4903.09. *In re Application of FirstEnergy Advisors* at ¶ 27. This case is distinguishable. The commission's opinion and order cites multiple places in the record in support of the 9.91 percent rate of return, and the commission's reasoning for adopting that rate is readily apparent from the opinion and order.

{¶ 28} Next, appellants argue that the commission erred under R.C. 4903.09 by failing to analyze "the accuracy of the data" submitted in Dominion's application, examine Dr. Duann's testimony, or consider whether adopting a rate of return based on current market conditions constitutes an important regulatory principle. But the question for determining compliance with R.C. 4903.09 is whether the commission showed "in sufficient detail, the facts in the record upon which the order is based, and the reasoning followed by [it] in reaching its conclusion," *MCI Telecommunications Corp.*, 32 Ohio St.3d at 312, 513 N.E.2d 337. As noted above, we find that the commission did this.

{¶ 29} Appellants also argue in their reply brief that the commission departed from R.C. 4903.09 by not discussing the effect of the COVID-19 pandemic on the proper rate of return. We earlier denied Dominion's motion to strike this argument, *see* 169 Ohio St.3d 1438, 2023-Ohio-482, 203 N.E.3d 725, but we now disregard the argument, given that it was raised for the first time in appellants' reply brief. *See Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, at ¶ 18.

### 4. Appellants' manifest-weight-of-the-evidence argument fails

{¶ 30} Appellants' remaining argument under its first proposition of law is that the commission's approval of the 9.91 percent rate of return was against the manifest weight of the evidence. In support of this argument, they say they were the only parties to present expert testimony concerning Dominion's cost of long-term debt, cost of equity, and capital structure on which to calculate a current rate of return.

{¶ 31} This court "will not reverse or modify a commission decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty." *In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, at ¶ 9. "An appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record." *Id.*

{¶ 32} It is true that appellants presented evidence in support of a rate of return based on current market conditions. For example, Dr. Duann's rate-of-return analysis used recent financial data from 2019 and 2020. Neither the commission's staff nor Dominion cross-examined Dr. Duann. And neither the staff nor Dominion furnished an alternative rate-of-return calculation based on current market

conditions. But appellants have failed to cite any authority that requires the commission to adopt a rate of return based on current market conditions in this case. Because the linchpin of appellants' manifest-weight argument rests on a requirement that does not exist in the current statutory scheme, we must reject it.

{¶ 33} The opinion concurring in part and concurring in judgment only in part agrees that "nothing in the statutory scheme explicitly requires [the commission] to set a rate of return for an alternative rate plan that precisely matches the company's most recent costs of acquiring capital," concurring opinion, ¶ 73, and that "[t]he consumers have failed to identify any statute that was violated or any legal error that was committed by [the commission]," *id.* at ¶ 76. But additionally, the opinion concurring in part and concurring in judgment only in part points out that there are ways that the commission could have reasonably considered current market conditions in this alternative-rate-plan proceeding, including by advancing Dominion's next base-rate case by one year, as it did here. *See id.* at ¶ 81. Nothing in this opinion should be read as *prohibiting* the commission from considering current market conditions in an alternative-rate-plan proceeding. We simply limit our discussion to the arguments presented to us and our statutorily prescribed scope of review under which we may reverse, vacate, or modify an order of the commission only when, upon consideration of the record, we find the order to be unlawful or unreasonable. *See* R.C. 4903.13. So regardless of what the opinion concurring in part and concurring in judgment only in part believes is "necessarily implicate[d]" by the statutory scheme, concurring opinion at ¶ 69, what is important here is that this court unanimously agrees that the commission's orders at issue in this case are neither unlawful nor unreasonable.

*B. Arguments concerning ex parte communications*

{¶ 34} As a preliminary matter, we note that the commission has asserted that this court lacks jurisdiction over appellants' second proposition of law, part of which focuses on ex parte communications, because appellants did not preserve it

in a second rehearing application. Dominion raises a similar argument. Because we previously denied the commission's motion to dismiss in which it asserted the same argument, *see* 167 Ohio St.3d 1476, 2022-Ohio-2642, 192 N.E.3d 495, we proceed to consider the merits of appellants' second proposition of law.

{¶ 35} Appellants argue that the commission and its staff engaged in improper ex parte communications in violation of R.C. 4903.081 and Ohio Adm.Code 4901-1-09. They base this argument on the chairwoman's statement during the commission's December 30, 2020 meeting in which she thanked the staff for its "attentiveness and working with commissioners and better understanding everything in the case and how it came about." Public Utilities Commission Meeting of December 30, 2020, available at https://www.youtube.com /watch?v=d_ozIp9-4tQ (accessed June 1, 2023).

{¶ 36} R.C. 4901.19 authorizes the commission to "appoint * * * experts, engineers, accountants, and such other officers as it considers necessary." All parties generally agree that this statute authorizes the commission to appoint and consult with staff for the purpose of helping it carry out its statutory duties. After a case has been assigned a formal docket number, however, no commission member "shall discuss the merits of the case with any party or intervenor to the proceeding, unless all parties and intervenors have been notified and given the opportunity of being present or a full disclosure of the communication insofar as it pertains to the subject matter of the case has been made." R.C. 4903.081; *accord* Ohio Adm.Code 4901-1-09. "[T]he purpose of the statute is to prevent a party from gaining an unfair advantage over an opposing party through *ex parte* communications with the decisionmaker." *Myers v. Pub. Util. Comm.*, 64 Ohio St.3d 299, 303, 595 N.E.2d 873 (1992).

{¶ 37} Appellants claim that the commission's staff is a "party" for purposes of R.C. 4903.081 based on Ohio Adm.Code 4901-1-10(C), which provides that "[e]xcept for purposes of rule[] * * * 4901-1-30, * * * the commission

staff shall not be considered a party to any proceeding." Ohio Adm.Code 4901-1-30(A) addresses the commission's procedures for handling stipulations; it specifies that "[a]ny two or more parties may enter into a written or oral stipulation concerning issues of fact, the authenticity of documents, or the proposed resolution of some or all of the issues in a proceeding." When read together with R.C. 4903.081, Ohio Adm.Code 4901-1-10(C) and 4901-1-30(A) convey that a signatory to a stipulation—as the commission's staff was here—is a party for purposes of the statute.

{¶ 38} The commission disputes this reading, asserting that because Ohio Adm.Code 4901-1-10(C) does not expressly identify Ohio Adm.Code 4901-1-09 as one of the contexts in which its staff shall be considered a party, the staff is not a party for purposes of Ohio Adm.Code 4901-1-09 and R.C. 4903.081. We conclude that the commission's reading is incorrect. Even assuming that the absence of a reference to Ohio Adm.Code 4901-1-09 in Ohio Adm.Code 4901-1-10(C) means that the commission's staff is excluded from the former's requirements regarding ex parte discussion of cases, the requirements of R.C. 4903.081, which are mirrored in Ohio Adm.Code 4901-1-09, still remain. And nothing in R.C. 4903.081 empowers the commission to waive by rule the requirements that the statute imposes on commission members and parties regarding discussions about the merits of a case.

{¶ 39} Even so, to establish a violation of R.C. 4903.081, appellants must show that a commission member "discuss[ed] the merits of the case" with the staff in its capacity as a party. *See Cincinnati v. Pub. Util. Comm.*, 64 Ohio St.3d 279, 280, 595 N.E.2d 858 (1992), fn. 4 (no violation of R.C. 4903.081 when the evidence "[did] not establish that the merits of [the case] were discussed" between the commission's chairman and the chief executive officers of two utility companies). In legal usage, the term "merits" denotes "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case,

as opposed to extraneous or technical points, esp. of procedure." *Black's Law Dictionary* 1139 (10th Ed.2014).

{¶ 40} In this case, appellants asked the commission in their rehearing application to "explain[] on rehearing to what extent, if at all, the merits of this case were part of the communications referenced in the Commissioners' remarks when the Order was signed." The commission's second entry on rehearing explained that the chairwoman's statement was "nothing more than a statement of appreciation for [the] Staff's efforts to assist Commissioners with understanding the background of the issues in the case." Appellants' suggestion that the communication was more than one of appreciation rests on speculation. *See In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, at ¶ 50 ("We will not reverse a commission order based on speculation"). Without evidence of wrongdoing, the commission is therefore presumed to have conducted itself within the bounds of the law. *See In re Application of Am. Transm. Sys., Inc.*, 125 Ohio St.3d 333, 2010-Ohio-1841, 928 N.E.2d 427, ¶ 23, quoting *State ex rel. Shafer v. Ohio Turnpike Comm.*, 159 Ohio St. 581, 590, 113 N.E.2d 14 (1953) (" 'in the absence of evidence to the contrary, public officers, administrative officers and public boards * * * will be presumed to have properly performed their duties and not to have acted illegally but regularly and in a lawful manner' " [ellipsis sic]).

{¶ 41} Appellants next argue that they were deprived of their due-process rights because they were "given no opportunity to rebut the extra-record information [the commission's] Staff provided to [the] commissioners." But again, appellants have not provided evidence to verify their speculation that the commission's staff provided "extra-record information" to the commissioners in a way that violates R.C. 4903.081.

{¶ 42} Also unavailing is appellants' reliance on *State ex rel. Owens-Illinois, Inc. v. Indus. Comm.*, 61 Ohio St.3d 456, 575 N.E.2d 202 (1991). In that case, this court stated that "due process demands an opportunity to rebut the

evidence presented." *Id.* at 458. Here, appellants participated in a hearing before the commission in which they were able to challenge the stipulation and other documentary and testimonial evidence presented by Dominion and the commission's staff. In this way, appellants received the due process described in *Owens-Illinois*.

{¶ 43} This is not to say that the commission can enter adverse factual findings against a party when the party had no opportunity to challenge the evidence on which those findings are based. Indeed, this court held such a practice to be unlawful in *Tongren*, 85 Ohio St.3d 87, 706 N.E.2d 1255. In that case, the commission had issued an order that referred to and relied on findings by its staff, but the record did not contain those findings or the facts underlying those findings. *Id.* at 90. Therefore, this court held that the order was unlawful for failing to meet the requirements of R.C. 4903.09, *id.* at 92-93, which, as previously explained, requires that in contested cases the commission enter "findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact," R.C. 4903.09. In *Tongren*, the court explained that the commission's order failed to "disclos[e] the sources of its information to those who most require it, thereby preventing the complaining party from demonstrating prejudice." *Id.* at 92.

{¶ 44} *Tongren* is distinguishable, however, because appellants have not pointed to anything in the proceedings of this case that is comparable to what this court invalidated in *Tongren*. Because the opinion and order in this case is "sufficiently supported by evidence admitted at the hearing," *Vectren Energy Delivery of Ohio, Inc. v. Pub. Util. Comm.*, 113 Ohio St.3d 180, 2006-Ohio-1386, 863 N.E.2d 599, ¶ 50, *Tongren* does not apply.

*C. Arguments concerning the remaining prongs of the three-part test for evaluating the reasonableness of the stipulation*

**1. The commission did not err in determining that the stipulation was a product of serious bargaining among capable, knowledgeable parties**

{¶ 45} Appellants also argue in their second proposition of law that the stipulation was not a product of serious bargaining among capable, knowledgeable parties. Appellants' particular concern here is that because the commission's staff does not represent the interests of residential utility customers and has no pecuniary interests in the outcome of the bargaining, the staff used the stipulation to negotiate away the interests of the residential utility customers represented by OCC and NOPEC.

{¶ 46} To begin with, appellants do not point to any evidence that contradicts the commission's finding that all parties were invited to the bargaining table, were allowed the opportunity to circulate settlement proposals, and were represented by competent counsel and technical experts. Nor does it follow that the stipulation approved by the commission is legally defective merely because appellants' proposals did not carry the day. Moreover, because we are not privy to the contents of the parties' settlement discussions, we decline the invitation to draw an adverse inference about how the commission's staff conducted itself during the settlement process. *See Bailey v. United States*, 721 F.2d 357, 361 (Fed.Cir.1983) ("Courts are, of course, traditionally hesitant to inquire into the give and take of the negotiations leading to a settlement").

**2. The commission did not err in concluding that the settlement, as a package, benefits ratepayers and the public interest**

{¶ 47} Appellants assert that the settlement, as a package, does not benefit ratepayers and the public interest. They assert that the settlement departs from this aspect of the three-part test for evaluating the reasonableness of a settlement because it was joined by only two parties, which, they say, relaxed Dominion's

burden of proof to justify approval of its application and permitted the commission to evade appellants' objections to the settlement. In their view, these flaws amount to a due-process violation.

{¶ 48} To begin with, appellants appear to have confused a question of substance with one of procedure. In any event, appellants' arguments are unpersuasive for several reasons.

{¶ 49} First, the settlement did not foreclose appellants from raising objections. Among other things, appellants objected to the settlement with documentary and testimonial evidence—including cross-examination of Dominion's regulatory and pricing director, Vicki Friscic, who sponsored and testified in support of the settlement—briefs, and a rehearing application. The commission plainly discussed the analysis of appellants' witness, Dr. Duann, in its order, but ultimately decided not to adopt his recommendations. That alone does not establish error. *See Consumers' Counsel v. Pub. Util. Comm.*, 114 Ohio St.3d 340, 2007-Ohio-4276, 872 N.E.2d 269, ¶ 28 ("The commission did not ignore the evidence offered by OCC; the commission rejected it").

{¶ 50} Second, the commission did not relieve Dominion of its burden of proof. "When the commission reviews a contested stipulation, the requirement of evidentiary support remains operative." *In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 46, 2011-Ohio-2383, 950 N.E.2d 164, ¶ 19. As noted above, the 9.91 percent rate of return approved by the commission is supported by evidence in the record. Appellants discount this on their assertion that Dominion should have calculated a new rate of return based on current market conditions. But as explained above, their argument finds no support in the cited authorities.

{¶ 51} Third, appellants cite no authority to support their due-process argument. The analysis in *Ohio Edison Co. v. Pub. Util. Comm.*, 63 Ohio St.3d 555, 589 N.E.2d 1292 (1992), which is the only decision they cite, does not mention the phrase "current market conditions" at all.

{¶ 52} Appellants also argue that the 9.91 percent rate of return is a sign that the settlement, as a package, does not benefit ratepayers and the public interest, because the rate of return is too high in light of current market conditions. But the question is not whether one feature of the settlement viewed in isolation is unreasonable; rather, this court must consider the reasonableness of the settlement as a package. On this point, the commission found that based on Friscic's testimony and the settlement's terms, the settlement benefits ratepayers and the public interest because, among other things, it promotes safe and reliable service through the replacement of Dominion's aging facilities, institutes rate caps on customers' bills, limits the impact to customers' utility bills by incorporating a $310 million offset to depreciation expenses reflected in Dominion's base rates, and contributes $750,000 in shareholder funds to Dominion's heating-assistance program. Viewing the settlement package in this light, we cannot conclude that the commission erred in determining that the settlement, as a package, benefits ratepayers and the public interest. *Constellation NewEnergy, Inc.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 49 (rejecting claim that a settlement, as a package, did not benefit ratepayers and the public interest).

### III. CONCLUSION

{¶ 53} The commission's orders are neither unreasonable nor unlawful. We therefore affirm them.

Orders affirmed.

KENNEDY, C.J., and FISCHER, BRUNNER, and EPLEY, JJ., concur.

DEWINE, J., concurs in part and concurs in judgment only in part, with an opinion joined by DONNELLY, J.

CHRIS EPLEY, J., of the Second District Court of Appeals, sitting for DETERS, J.

_____

**DEWINE, J., concurring in part and concurring in judgment only in part.**

{¶ 54} I concur in the majority's decision to affirm the orders of the Public Utilities Commission of Ohio ("PUCO") in this case. I write separately because I disagree with the majority's treatment of the first proposition of law. I worry that the majority opinion will cause confusion in future alternative-rate-plan cases. And I fear that it will be read to mean that PUCO need not consider current market conditions when setting a rate of return in alternative-rate-plan cases. In my view, current market conditions are an appropriate consideration. But here, PUCO did take into account current market conditions when it ordered Dominion Energy of Ohio to advance its filing of a new base-rate case to October of this year. In view of all the circumstances, I do not find its orders to be unreasonable.

## PUCO Approves Dominion's Alternative Rate Plan but Modifies the Stipulation to Require that Dominion File a New Base-Rate Case by October 2023

{¶ 55} At issue is PUCO's decision to approve an alternative rate plan, allowing Dominion to charge customers for capital investments that it made in the past. No one disputes that Dominion should be able to recover for these investments. The question is the appropriate rate of return that Dominion should receive from ratepayers on these investments.

{¶ 56} In simplified terms, the rate of return is the percentage return that a utility receives on its assets.[2] *Cleveland v. Pub. Util. Comm.*, 164 Ohio St. 442, 444, 132 N.E.2d 216 (1956). It is essentially the amount that a utility may charge customers over and above its operating costs. So if a utility had a $100 capital base and a 10 percent rate of return, it would be entitled to collect a $10 return from

_____

2. *See* Phillips, *The Regulation of Public Utilities* 375-376 (3d Ed.1993) ("the rate of return is the amount of money earned by a public utility, over and above operating costs, expressed as a percentage of the rate base").

customers on those assets. Two components are generally used to calculate the rate of return: the cost of long-term debt and the return on equity. *See Babbit v. Pub. Util. Comm.*, 59 Ohio St.2d 81, 90-91, 391 N.E.2d 1376 (1979). In essence, a rate of return needs to be set at a level that is high enough that the utility can borrow money in capital markets and attract equity investment, thereby allowing the company to make necessary investments in facilities and equipment. *See* 1 Priest, *Principles of Public Utility Regulation* 195-196 (1969). But, of course, if the rate of return is set too high, there will be a perverse incentive for the utility to overinvest in—or "gold plate"—its own facilities.[3]

{¶ 57} An alternative rate plan is a statutory alternative to traditional rate setting. R.C. 4929.01(A). In a traditional rate case, PUCO establishes rates based upon a statutorily prescribed formula that requires PUCO to make a complex set of determinations about such things as the valuation of the utility's property on a date certain, the utility's costs in rendering services over a defined test period, taxes, and "a fair and reasonable rate of return." R.C. 4909.15. The process for approval of an alternative rate plan is much simpler. The applicant need establish only that the plan (1) accords with state law prohibiting discrimination in the supply of natural gas to its customers, (2) is in "substantial compliance with the policy of this state" set forth in R.C. 4929.02, and (3) is "just and reasonable." R.C. 4929.05(A).

{¶ 58} In its application for an alternative rate plan, Dominion proposed a 9.91 percent pretax rate of return. Dominion represented that that rate of return reflected the gross-up of the current federal-income-tax rate and the rate-of-return components authorized in its last base-rate case. Dominion said that it used this number because it was PUCO's regular practice to use the rate of return established in the utility's last base-rate case when considering an application for approval of

---

3. *See* 2 Goodman, *The Process of Ratemaking* 849 (1998) (" 'Gold plating' refers to a company's investing in the most expensive equipment or producing the most expensive service regardless of the need or efficiency of the operation to maximize returns without diminishing sales").

an alternative rate plan. PUCO's staff and Dominion entered into a stipulation to approve the alternative rate plan using Dominion's proposed rate of return.

{¶ 59} The Ohio Consumers' Counsel and the Northeast Ohio Public Energy Council (collectively, "the consumers") objected, arguing that a 9.91 percent rate of return was unreasonably high in light of current market conditions. They introduced testimony from Dr. Daniel Duann, assistant director of analytical services for the Office of the Ohio Consumers' Counsel. Dr. Duann explained that in Dominion's last base-rate case, PUCO had imposed a stipulated rate of return of 8.49 percent,[4] which was imputed from a capital structure of 48.66 percent long-term debt and 51.34 percent equity, a cost of debt of 6.50 percent, and a return on equity of 10.38 percent.

{¶ 60} Dr. Duann opined that the 9.91 percent rate of return is inconsistent with current market conditions. He noted that Dominion's cost of debt as of June 2020 was only 2.29 percent, and asserted that that figure should be used for the debt component of the rate-of-return calculation. He also opined that the 10.38 percent return on equity established in Dominion's last base-rate case was out of step with the return on equity authorized in recent rate cases across the country. Based on other utilities' rate cases and his assessment that Dominion faces less risk than other gas-distribution utilities, Duann proposed that a return on equity of 9.36 percent should be used. He applied these figures to the capital structure determined in Dominion's 2008 base-rate case (48.66 percent long-term debt and 51.34 percent equity), made an adjustment to account for changes in federal-income-tax laws since 2008, and arrived at a proposed pretax rate of return of 7.2 percent.

{¶ 61} PUCO overruled the consumers' objections and approved a stipulated settlement between PUCO's staff and Dominion. *In re Application of E.*

---

4. The variance between the 8.49 percent pretax rate of return calculated in the 2008 base-rate case and the 9.91 percent rate of return at issue here is due to changes in federal tax law. Both Dominion and the consumers' expert, Duann, agree that a gross-up factor of 1.2658 is appropriate to account for the tax-law changes.

*Ohio Gas Co.*, Pub. Util. Comm. No. 19-468-GA-ALT, 2020 Ohio PUC LEXIS 1857, *85-87 (Dec. 30, 2020). In authorizing the 9.91 percent rate of return, PUCO cited its "long-standing practice" of applying the rate of return approved in a utility's most recent base-rate case to the utility's later alternative-rate-plan and rider proceedings. *Id.* at *62-63. It further explained that it had recently used this practice when calculating credits for Dominion's customers in another case and that fairness dictated that the same practice be employed for calculating Dominion's cost recovery. *Id.* at *62. It also pointed out that Dominion's cost of capital was tied to its capital structure and that modifying the long-term-debt rate "would necessarily involve 'cherry picking,' while ignoring any cost increases that have occurred since the [2008 base-rate case]." *Id.* It noted further that while the consumers focused on Dominion's current cost of debt, Dominion's investments from 2011 through 2018 were made at higher costs. *Id.* at *64. In addition, it explained that it was compelled to consider the stipulation "as a package" and that the stipulation provided numerous benefits to Dominion's customers, including residential caps on rates, which limited Dominion's ability to pass on capital expenses to its customers. *Id.* at *59-60.

{¶ 62} The consumers filed for rehearing. As one of its arguments, Northeast Ohio Public Energy Council asserted that if it was PUCO's position that a rate of return could only be calculated in a base-rate case, PUCO should direct Dominion to file a new base-rate case by the end of 2021. PUCO partly agreed with the suggestion. *See In re Application of E. Ohio Gas Co.*, Pub. Util. Comm. No. 19-468-GA-ALT, 2022 Ohio PUC LEXIS 216, *20 (Feb. 23, 2022). It ordered Dominion to file a new base-rate case no later than October 2023, instead of the October 2024 date set forth in the stipulation. *Id.* PUCO explained:

> In the pending case, [the consumers] argued, and Dominion cannot deny, that, since the approval of its last base rate case in 2008, the

25

Company's cost of debt initially dropped from 6.50 percent to 4.23 percent and, currently, its cost of debt is 2.25 percent. * * * [I]t has been the Commission's long-standing practice to utilize the cost of capital and capital structure approved in the utility's last base rate case in subsequent alternative rate plan and rider cases. However, in consideration of the significant decrease in the Company's current cost of debt rate since its last rate case, and considering that Dominion refinanced all of its long-term outstanding debt at the current lower rate, as well as that the agreed upon date for Dominion to file its next base rate case is nearly three years away, the Commission finds that a more expedient alignment of the Company's cost of capital and capital structure with market conditions is appropriate and necessary. This is particularly so given that it has been more than a decade since the Company's last base rate case. Accordingly, upon further consideration of the issues raised by [the consumers] regarding the cost of capital, rate of return, and capital structure, the Commission finds that the Stipulation should be modified to require Dominion to file its next base rate case application by October 2023 * * *.

(Citations omitted.) *Id.* at *21-22. With this modification, PUCO approved the alternative rate plan.

**The Majority Affirms PUCO's Approval of the Alternative Rate Plan**

{¶ 63} The consumers appealed. In their first proposition of law, they take aim at the rate of return. The crux of their argument is that PUCO acted unlawfully in using a 12-year-old rate of return instead of one based on current market conditions. The consumers cite the requirement that in evaluating a proposed stipulation, PUCO must consider whether the stipulation "violates any important

regulatory principle or practices." *Babbit*, 59 Ohio St.2d 81, 391 N.E.2d 1376. They also cite R.C. 4929.05 and other statutes and regulations that they contend require PUCO to consider current market conditions. PUCO argues that there is no such regulatory principle, and that nothing in the relevant statutory or administrative provisions requires consideration of current market conditions.

{¶ 64} The majority agrees with PUCO. In disposing of the consumers' arguments, it goes through relevant statutory provisions, noting that the phrase "current market conditions" is not explicitly written into any of them. From this, it infers that PUCO need not consider current market conditions in the approval of an alternative rate plan.

{¶ 65} The majority begins its analysis with R.C. 4929.05(A), which requires as a condition for approval of an alternative rate plan that PUCO determine that the plan is "just and reasonable," R.C. 4929.05(A)(3). It then jumps to its conclusion:

> [N]othing in the statute requires that a just and reasonable rate of return be based on current market conditions as [the consumers] argue. The absence of the phrase "current market conditions" from the statute—as well as the other statutes and the rule discussed below—is significant. In matters of statutory interpretation, this court cannot insert or delete words. *In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, ¶ 26.

Majority opinion, ¶ 13.

{¶ 66} The majority performs a nearly identical analysis for other statutory provisions, treating its review like a game of word search. It looks through the relevant statutory provisions, fails to find the phrase "current market conditions,"

27

and announces that the matter is settled. In my view, such an analysis is overly simplistic and will cause problems in future cases. As I will explain, a much more robust review is required.

**Current Market Conditions Are an Appropriate Consideration in Determining the Reasonableness of an Alternative Rate Plan**

{¶ 67} A reader could easily conclude from the majority opinion that PUCO need not even consider current market conditions when deciding whether to approve an alternative rate plan. I don't think that's a fair account of the law of this state.

{¶ 68} The criteria PUCO must use to approve an alternative rate plan is established by statute. *See* R.C. 4929.05(A)(1). Before it may approve an alternative rate plan, PUCO must find that three substantive criteria are met. First, that the natural-gas company is in compliance with the statutory policy prohibiting discrimination in the supply of natural gas to its customers. R.C. 4929.05(A)(1), citing R.C. 4905.35. Second, that the natural-gas company is in "substantial compliance with the policy of this state" set forth in R.C. 4929.02. R.C. 4929.05(A)(1) and (2). Finally, and most relevant here, that the alternative rate plan is "just and reasonable." R.C. 4929.05(A)(3).

{¶ 69} This third requirement—that the plan be "just and reasonable"— necessarily implicates the current market conditions for obtaining capital. The rate of return is a key element of the amount that customers will pay for natural gas under a plan. And the rate of return is based on the cost of obtaining money in equity and capital markets. So "current market conditions"—i.e., what it costs to obtain money in those markets today—is obviously a relevant consideration in determining whether a rate is just and reasonable.

{¶ 70} The majority dismisses any consideration of current debt and equity markets on the basis that the words "current market conditions" are not found anywhere in the text of the relevant statutes. But that makes little sense. No one

disputes that the words "current market conditions" aren't in the statutory text. But a utility's costs obviously affect whether its rates are "just and reasonable." *See generally Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm. of West Virginia*, 262 U.S. 679, 693, 43 S.Ct. 675, 67 L.Ed. 1176 (1923) ("A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally"). Current market conditions, of course, are not the only determinant of whether a rate is "just and reasonable." But they are certainly something that bears on the analysis.

{¶ 71} The same goes for the requirement that PUCO find that the natural-gas company is in "substantial compliance with the policy of this state" set forth in R.C. 4929.02, R.C. 4929.05(A)(1) and (2). Among other things, the policy of the state is to "[p]romote the availability to consumers of adequate, reliable, and reasonably priced natural gas services." R.C. 4929.02(A)(1). The majority dismisses any claim that this provision is implicated, saying simply, "[N]othing in R.C. 4929.02 requires that a rate of return be based on current market conditions." Majority opinion at ¶ 14. But again, while nothing in R.C. 4929.02 *requires* that a rate of return be based on current market conditions, current market conditions are certainly something that factors into the analysis of whether natural-gas services are "reasonably priced." Few people would think that an item is "reasonably priced" if it is priced so high that its producer receives profits that are disproportionate to what other producers earn in the same market.

{¶ 72} Other policies of this state with which PUCO must determine the utility is in substantial compliance include "encourag[ing] * * * market access for cost-effective supply- and demand-side natural gas services and goods," R.C. 4929.02(A)(4), and "facilitat[ing] the state's competitiveness in the global economy," R.C. 4929.02(A)(10). The utility's compliance with each of these policies fundamentally depends on current market conditions. What is "cost

effective" or what "facilitates competitiveness" will vary widely depending on the market. And allowing Ohio's utilities to receive a rate of return that is higher than what out-of-state utilities receive, and thus charge higher prices, will not facilitate the state's competitiveness.

{¶ 73} The majority is, of course, correct that nothing in the statutory scheme explicitly requires PUCO to set a rate of return for an alternative rate plan that precisely matches the company's most recent costs of acquiring capital. But the statutory scheme does task PUCO with determining that an alternative rate plan complies with broad statutory criteria—like whether it is reasonable. In my view, these criteria will almost always necessarily require some consideration by PUCO of current market conditions, as well as a myriad of other factors.

### PUCO's Orders Were Not Unreasonable or Unlawful

{¶ 74} Our standard of review for PUCO orders is set by statute. We may reverse, modify, or vacate a PUCO order only when, upon consideration of the record, we conclude that the order was "unlawful or unreasonable." R.C. 4903.13. Unlawfulness and unreasonableness are distinct concepts within our standard of review. *See In re Application of Firelands Wind, L.L.C.*, __ Ohio St.3d __, 2023-Ohio-2555, __ N.E.3d __, ¶ 11. A PUCO order is unlawful if it rests on an erroneous interpretation of the law or if PUCO fails to follow procedures prescribed by statute or its own regulations. *See id.* at ¶ 12 (collecting cases construing the "unlawful" part of the standard of review). An order is "unreasonable" when PUCO's exercise of its discretion in making determinations within broad statutory criteria falls outside the "zone of permissible statutory construction," *id.* at ¶ 15. We have also found an order of a state administrative agency to be unreasonable when the decision is "manifestly contrary to the evidence in the record or when the evidence clearly isn't enough to support the decision" or when the order is "internally inconsistent." *Id.* at ¶ 16. Our review of such questions of law is de novo. *Id.* at ¶ 13.

**{¶ 75}** The consumers focus mostly on the "unlawful" part of the standard of review, suggesting that various statutes and caselaw establish a rule that a rate of return *always must* be based on the most current market data. But as the majority points out, none of the cited authorities say exactly that. And in contrast to the statutory formula for a base-rate case, there is no explicit requirement for the calculation of a rate of return in the alternative-rate-plan statute. *See* R.C. 4929.05. Unlike the majority, I read the relevant statutes to make current market conditions a consideration in determining the reasonableness of a rate of return. But I don't read them to mandate that the rate of return must always replicate the most recent market data. So I don't think PUCO acted *unlawfully* by not calculating the rate of return in the manner that the consumers proposed.

**{¶ 76}** Moreover, PUCO did consider current market conditions. It explicitly modified its order on rehearing to require that Dominion advance the filing of its next base-rate case because of its concern that the rate of return established in Dominion's last rate case may no longer be reflective of market conditions. *See In re Application of E. Ohio Gas*, Pub. Util. Comm. No. 19-468-GA-ALT, 2022 Ohio PUC LEXIS 216, *1. Thus, I have little difficulty in concluding that PUCO's orders are not unlawful. The consumers have failed to identify any statute that was violated or any legal error that was committed by PUCO.

**{¶ 77}** The "unreasonable" part of the standard of review comes into play for our review of PUCO's determination that Dominion's alternative rate plan comported with the broad statutory criteria established by the legislature in R.C. 4929.05—most notably, is the plan "just and reasonable"? By using this kind of open-textured language, the legislature has necessarily granted to PUCO a degree of discretion in its implementation of the statute. *See In re Application of Firelands Wind, L.L.C.*, __ Ohio St.3d __, 2023-Ohio-2555, __ N.E.3d __, at ¶ 11, 15. Our

task is to determine whether PUCO's exercise of its implementation authority fell within the zone of permissible statutory construction. *See id.* at ¶ 15.

{¶ 78} In my view, it did. First, PUCO relied upon its regular practice of using the rate of return established in a utility's most recent base-rate case. There are good reasons for that practice. The legislature created "alternative rate plans" to allow for a proceeding that is faster and less evidence-intensive than a traditional base-rate case. *See* Am.Sub.H.B. No. 476, 146 Ohio Laws, Part III, 5244, 5254-5259. The rate-of-return analysis is a complex procedure that requires not just a determination of the cost of debt, but also the cost of equity of the company's capital structure. PUCO rightfully noted the "cherry-picking" concern of focusing on one element of the rate-of-return analysis without also considering the capital structure.[5]

{¶ 79} PUCO also cited fairness reasons for using its regular practice here, explaining that it had used the same rate-of-return analysis when calculating credits for Dominion customers. *See In re Application of E. Ohio Gas*, Pub. Util. Comm. 19-468-GA-ALT, 2020 Ohio PUC LEXIS 1857, at *61. It also pointed out that much of Dominion's debt had initially been incurred at a time when borrowing costs were higher. *Id.* at *64. Further, PUCO's responsibility was to determine whether the package as a whole was "just and reasonable." The rate of return was one element of the alternative rate plan. But PUCO identified other elements that it found to benefit Dominion's customers, including rate caps. *Id.* at *59-60.

{¶ 80} This is not to say the consumers did not make a strong argument that Dominion's current rate of return is out-of-whack with its current cost of debt. They did. And had PUCO simply affirmed the stipulation, I might well agree that PUCO acted unreasonably.

---

5. Because the return on equity is traditionally higher than the cost of debt, a change in the debt/equity ratio will necessarily affect the rate of return. *See generally* Bonbright, Danielsen & Kamerschen, *Principles of Public Utility Rates*, Chapter 14: The Fair Rate of Return (2d Ed.1988).

{¶ 81} But PUCO did not affirm the stipulation.  It imposed an additional requirement that Dominion advance its next base-rate case, ensuring that the rate of return is recalculated at an earlier date than it otherwise would have been.  In my view, PUCO reasonably adhered to its consistent practice of deferring rate-of-return determinations to base-rate cases while at the same time addressing the consumers' concerns that Dominion's rate of return should be reviewed.  Thus, I do not find its orders to be unreasonable.

### Conclusion

{¶ 82} I agree with the majority's conclusion that PUCO did not act unreasonably or unlawfully in approving Dominion's application for an alternative rate plan.  But I disagree with much of the majority's analysis of the consumers' first proposition of law.  So I concur in judgment only as to its resolution of that proposition.  I concur in the rest of the majority's opinion.

DONNELLY, J., concurs in the foregoing opinion.

_____

Bruce Weston, Ohio Consumers' Counsel, and John Finnigan and William J. Michael, Assistant Consumers' Counsel, for appellant Office of the Ohio Consumers' Counsel.

Bricker & Eckler, L.L.P., and Dane Stinson; and Glenn S. Krassen, General Counsel, for appellant Northeast Ohio Public Energy Council.

Dave Yost, Attorney General, and John H. Jones, Werner L. Margard III, Shaun P. Lyons, and Rhiannon D. Plant, Assistant Attorneys General, for appellee.

Dominion Energy Services, Inc., and Andrew J. Campbell; Whitt Sturtevant, L.L.P., Christopher T. Kennedy, and Albert D. Sturtevant; and McGuire Woods, L.L.P., and Robert W. Loftin, for intervening appellee.

_____